## SYNOD OF DAKOTA v. STATE.

1. Section 3, Art. 6, of the constitution of this state, provides that "no money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution;" and Section 16, Art. 8, provides: "No appropriation of lands, money or credits to aid any sectarian school shall ever be made by the state or any county or municipality within the state, * * * and no sectarian instruction shall be allowed in any school or institution aided or supported by the state." *Held*, that these provisions of the constitution were interded to be and are self-executing, and require no act of the legislature to become operative, but of themselves control all legislation upon the subject of appropriating money or other property "for the benefit of" or "to aid" any sectarian school, society, or institution, and control and limit the powers of all state, county, and municipal officers in auditing or paying any such appropriation.

2. *Held, further*, that the prohibition in the constitution of the appropriation of any money or other property "to aid" any sectarian school applies to all appropriations to such schools, whether made as a donation or in payment for services rendered the state by such school.

3. The purpose for which the plaintiff corporation was organized and exists was and generally is to maintain and promulgate the doctrine and belief of the Christian religion of the sect known as "Presbyterians," and that it has offered and given secular and sectarian instruction to divers and numerous students in the Pierre University, under its control. *Held*, that such university, under the control of plaintiff, and in which a class of students was instructed in the methods of teaching for the state, and for the tuition of which the money sued for in this action is claimed, is a sectarian school, within the meaning of the term "sectarian school" as used in the state constitution.

4. By a law of 1887, prior to the adoption of the state constitution, the territorial board of education was authorized to designate private universities, colleges, and academies in which instruction should be given to classes of pupils in such institutions in the methods of teaching, under such rules and regulations as the said board of education should prescribe; the tuition of which students should be paid by the territory. *Held*, that the law, so far as it authorized the designation of sectarian universities, colleges, or academies by said board of

education in which such classes should be taught, was inconsistent with and repugnant to the provisions of the state constitution, and became inoperative and ceased to be of binding force or effect after the adoption of the state constitution, within the state.

5.  A contract was made by said territorial board of education with the plaintiff in 1887 for the instruction of a class of students in the methods of teaching at the Pierre University, providing that such contract should only be terminated by three months' notice by the said board of education. *Held*, that the board of education was not authorized by the law to make a contract for any definite term, and that the clause in the contract above referred to, fixing such limitation of time, did not survive the repeal of the law, and was not, therefore, binding upon the state, and that such contract was not one protected by Section 10, Art. 1, Const. U. S., which provides that no state * * * shall pass any law impairing the obligations of contracts.

6   The rules and regulations prescribed by the board of education for the universities, colleges, and academies designated by said board in which classes of students should be taught the methods of teaching provided that the course of instruction for such students should be as prescribed by the said board of education; that the principal and teachers of the normal department of the school so designated should be approved by such board; and that the students of the normal department should be excused, if they so desired, from any exercises where sectarian doctrine should be taught, or any comments made upon the scriptures. *Held*, that, notwithstanding these and other similar rules and regulations, as the teachers in such normal department in the Pierre University were selected, employed and paid by the plaintiff, subject only to the approval of the board of education, and constituted a part of its faculty, and that the money claimed in this action, if paid, will go to the plaintiff, and not to the teachers directly, its payment to plaintiff would be "to aid" the plaintiff, and therefore comes within the prohibition of the constitution of this state.

(Syllabus by the Court.   Opinion filed Dec. 22, 1891.)

Original action by the Synod of Dakota against the State of South Dakota to recover for the tuition and instruction of certain students.   The case was presented to the court upon the complaint and answer and a stipulation as to the facts. Judgment for the defendant.   No briefs filed.

The facts are stated in the opinion.

*Crawford & DeLand* for plaintiff.

*Robert Dollard, Attorney General,* for defendant.

CORSON. J.   The plaintiff, in pursuance of the provisions of Chapter 1, Laws 1890, commenced this action in this court to

recover from the state the amount alleged to be due to it for the tuition and instruction of a class of students during the year 1890 at the Pierre University, located in the city of Pierre, under the control and management of the plaintiff, which said tuition and instruction was given to said class of students by virtue of an alleged contract made with said plaintiff by the board of education of the late Territory of Dakota in 1887, in pursuance of the powers conferred upon said board of education by the provisions of Sections 1840-1845, inclusive, Comp. Laws. An answer was filed on behalf of the state by the Hon. Robert Dollard, its attorney general, setting up as a defense, briefly stated, that the plaintiff was a sectarian corporation, and the Pierre University was a sectarian school, under the control and management of the plaintiff, and that, under the provisions of the constitution of the state, the state is prohibited from making any appropriation or paying any state funds "for the benefit of" or "to aid" any sectarian school. The case was presented to the court upon the complaint and answer and a stipulation as to the facts, which, so far as may be necessary to be stated, are, in substance, as follows: "*First.* That the plaintiff is a corporation organized and existing under and by virtue of the laws of the former Territory of Dakota and of the present State of South Dakota, and that it has so existed as such corporation during all the times hereinafter mentioned, and that the purpose for which said corporation was organized and does so exist was and is generally to maintain and promulgate the doctrines and belief of the Christian religion, and of the sect known as 'Presbyterians.' *Second.* That during all of said times the said plaintiff has been, and is now, the owner and proprietor of certain grounds, buildings, furniture, books, and apparatus, and has had in its employ a faculty of divers professors and instructors, and with and through and by means of the same has maintained and conducted a certain educational institution in the city of Pierre, in Hughes county, in said state, under the name of 'Pierre University.' That during all of said time it has maintained and supported said institution, and provided the necessary funds to equip and con-

duct the same and pay the expenses thereof, and has offered and given secular and sectarian instruction to divers numerous students therein at regular rates of tuition. That the board of education of the said Territory of Dakota, in the year 1887, in pursuance of Section 1841, Comp. Laws, designated the said Pierre University as one of the educational institutions in which a class of students should be taught the methods and practice of teaching in the common schools. That plaintiff duly accepted said designation and appointment, and agreed to and did comply with all the provisions of the law and the rules and regulations adopted and promulgated by said board of education. That it received into its said institution during the winter and spring of 1890 a designated number of students, to be, and which were, instructed as required by the board of education, in accordance with the terms of said agreement. That the account for the tuition and instruction of said class of students was duly presented to the state auditor for allowance, and that he refused to audit or allow the same; and that the sum claimed by the plaintiff is the proper amount to be paid, in case the state is authorized to pay the same."

The territorial act referred to as Sections 1840-1845, provides, in substance, that the territorial board of education shall designate private universities, colleges, and academies in which instruction shall be given to classes of not less than 10 nor more than 25, whose tuition shall be paid by the territorial treasurer; that the board shall prescribe the conditions of admission to the class, the course of instruction, and the rules and regulations under which instruction shall be given; that the board shall establish in the institutions designated, subject to their visitation, examinations in such branches of study as are taught, and shall determine the rules and regulations in accordance with which the same shall be conducted, and shall confer such honorary certificates or diplomas as they may deem expedient upon those pupils who satisfactorily pass such examination. Such examinations shall be prescribed in such studies, and shall be arranged and conducted in such manner, as in the

judgment of the board shall furnish a suitable preparation for teachers' work in the common schools, prominent among which shall be method of teaching and practice. Pursuant to the provisions of the statute referred to, the board adopted and promulgated a number of rules, the more important of which are as follows: "Each school so designated shall adopt the course of study for its normal department that is prescribed by the territorial board of education. The principal of the normal department, and all teachers in that department, must be approved by the territorial board. None of the classes whose tuition is paid by the territory shall be taught by any person not a graduate of some college or normal school of recognized merit, and who shall not have been approved by this board as before provided. Each school accepting this appointment binds itself to designate one member of its faculty as principal of the normal department, whose first and most important duty it shall be to teach the classes of the department, and supervise the work of any assistants he may have in the department; but nothing in this clause shall prevent his teaching classes in other departments of the school if his time permits, nor from receiving into the classes of the normal department any pupils of other departments that may be pursuing the same studies as normal class. The principal of the normal department of any institution accepting this appointment shall make an annual report to the territorial board, upon blanks furnished by this department. The pupils of this department of the school shall be excused, if they desire, from any exercises where sectarian doctrines are taught, or any comment made upon the Scripture. The territorial board may at any time, when, in its opinion, any school accepting this appointment is not doing satisfactory work, or when any of the rules and provisions of this agreement are not being observed, withdraw from such school, after a three months' notice, any pupils whose tuition is being paid by territorial funds. At the close of each term of twelve weeks the president or principal of any school so designated and the president of its board of trustees shall certify to the territorial board the name of each pu-

pil in attendance in the normal department, together with the length of time attended by each; and the territorial board will audit the amount due each school, allowing the sum of one dollar for each week's attendance of each pupil. The faculty of any of these schools may require of any pupils admitted on these conditions the same obedience to the rules and regulations of the school as are required of pupils in other departments, except as otherwise provided, and may inflict the same punishments and penalties for violation or infraction of rules and for neglect of duty."

1. It is contended by the learned counsel for the plaintiff that, as the alleged contract under which plaintiff claims was made in 1887, prior to the adoption of our state constitution, and was by its terms only to be terminated on three months' notice by the board of education, and, no such notice having been given by said board or their successor, the superintendent of public schools, prior to the performance of the services rendered by plaintiff, compensation for which is claimed in this action, the contract remained in force, and is protected by Section 10, Art. 1, Const. U. S., notwithstanding the adoption of the state constitution, and could not be affected or impaired by that instrument. The counsel cite the Dartmouth College Case, 4 Wheat. 518, and the numerous cases in which the doctrine established in that case has been affirmed. That the obligations of contracts are fully protected by the constitution of the United States is now well established. If the contract in this case was a definite one as to time, and one that the board was authorized to make, then there would be much force in the position of counsel, for neither the people in their aggregate capacity in forming a state constitution, nor through their representatives in the state legislature, can pass any law impairing the obligations of contracts. But an examination of the sections of the statute referred to discloses the fact that the board was not authorized to make any contract binding upon the territory for any definite term. The board was authorized to designate certain educational institutions in which classes of pupils should be instructed, but the law does not confer upon the

board the power to make any contract binding upon the territory for any specified length of time. All that part of the alleged contract therefore, providing for a continuance of the contract until terminated by notice of three months,—if the contract can properly be construed as such as to time,—was beyond the power of the board, and not binding upon the territory or its successor,—the state. It would have been competent for the legislature of the territory to have repealed the law at any time, and thereby put an end to the contract; and it was equally competent for the framers of the constitution to supersede it by provisions in the constitution with which the law conflicts. The laws in force when the constitution was adopted not inconsistent with that instrument, remained in force until changed by the state legislature; but all laws in conflict with that instrument upon its adoption became inoperative, and ceased to be of binding force within the state. See Enabling Act, Laws 1889, p. 34.

There being, therefore, no contract between the board of education and the plaintiff that would be protected under the constitution of the United States, it becomes necessary to determine whether or not the state can be required to pay for the services rendered by the plaintiff in view of the provisions of the state constitution. The provisions of the constitution of the state bearing upon the question are the last clause of Section 3, Art. 6, and Section 16, Art. 8. Section 3, Art. 6, provides that "no money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution;" and Section 16, Art. 8, provides that "no appropriation of lands, money or other property or credits to aid any sectarian school shall ever be made by the state or any county or municipality within the state * * * No sectarian instruction shall be allowed in any school aided or supported by the state." These provisions of the constitution were intended to be, and are, self-executing. They require no act of the legislature to become operative, but of themselves control all legislation upon the subject of appropriating money or other property for "the benefit of" or "to

aid" any sectarian school or institution, made after the adoption of the state constitution, and also control and limit the powers of all state, county, or municipal officers in auditing or paying any such appropriation. That the Pierre University is a sectarian school or institution, within the meaning of these provisions of the constitution, is not seriously controverted. The question, then, is, what constitutes an appropriation for "the benefit of" or "aid to" a sectarian school or institution? That such an appropriation is not limited to a gift or donation on the part of the state is clearly shown in Section 3, Art. 6, which provides: "No money or property of the state shall be given or appropriated." The state is not only prohibited from giving or donating state funds, but from appropriating them. This term "appropriation," used in this connection with "gift," was evidently intended to mean something different from gift or donation. The provision found in the bill of rights is limited to gifts or appropriations by the state. The provision in Section 16, Art. 8, includes counties and municipalities, as well as the state, and limits the prohibition to schools,—Article 8 being devoted to education and school lands; but the language is equally emphatic. "No appropriation * * * to aid any sectarian school shall ever be made;" and the section concludes with the provision: "And no sectarian instruction shall be allowed in any school or institution aided or supported by the state." It is apparent from these various provisions that the framers of our state constitution intended to guard with zealous care the funds of the state, counties, and municipalities, collected from taxes imposed upon all the members of the community, composing the various religious sects, from being appropriated for the benefit of or to aid any one or more sectarian schools or institutions, or in fostering or building up any one or more sects within the state. The policy of prohibiting the use of funds belonging to all for the benefit of one or more religious sects has been adopted in most of the states. No one, we think, can mistake the intention of the framers of the constitution, as expressed in these various sections of that instrument, to prohibit in every form, whether as a gift or otherwise,

the appropriation of the public funds for the benefit of or to aid any sectarian school or institution. What, then, constitutes benefit or aid? Webster defines "benefit" to mean "whatever contributes to promote prosperity; * * * add value to property; advantage; profit." "To aid" is defined by the same author "to support, either by furnishing strength or means to help to success." The demand of plaintiff is for money due for the tuition of a class of students alleged to have been instructed under a contract with the board of education. Would not the payment of this demand be for the benefit of or to aid the university? Is not the tuition received from every student for the benefit of or to aid the school, to support, to strengthen, it? Do not such institutions depend mainly upon the tuition fees of students they can obtain for their support? But the learned counsel for plaintiff strenuously contends that the sum due plaintiff will not be contributed for the benefit of or to aid the university, but in payment for services rendered the state, or to its students, in preparing them for teaching in the public schools. This contention, while plausible, is, we think, unsound, and leads to absurd results. If the state can pay the tuition of 25 students, why may it not maintain at the institution all that the institution can accommodate, and thereby support the institution entirely by state funds? The theory contended for by counsel would, in effect, render nugatory the provisions of the constitution, as the claim that the appropriation was made as compensation for services rendered could be made in all cases. This theory, carried out to its legitimate results, would enable any one leading sect to control the schools, institutions, and funds of the state, as it could claim it was rendering services for the funds appropriated. It was undoubtedly to prevent such possible results that these provisions were inserted in the constitution. It matters not how much consideration has been given by services rendered, the language is emphatic and unqualified that no money shall be given or appropriated for the benefit of or to aid any sectarian school, society, or institution. The paying of the tuition of pupils in the Pierre University to the plaintiff in this case will,

in our opinion, be for the benefit of or to aid such school or institution, and is clearly within the prohibition of the constitution.

This view of the provisions of our constitution is supported by two recent decisions, that we will now proceed to notice. The first is the case of State v. Hallock, 16 Nev. 373. It appears from the statement in that case that the constitution of the State of Nevada, as originally adopted, contained no provisions such as are found in our state constitution; but in 1880 the following provision was adopted as an amendment, being Section 10, Art. 11: "No public funds of any kind or character, whether state, county, or municipal, shall be used for sectarian purposes." After this section was adopted, the legislature of that state passed an act providing that certain orphans of the state should be supported at the expense of the state in a certain orphan asylum, under the control of a religious sect. A certain sum becoming due for the support, clothing, and care of orphans under the law, a *mandamus* was applied for to compel the state auditor to audit and allow the account, which he had refused to do on the ground that the law was in conflict with the state constitution. It was urged in that case, as in the case at bar, in support of the application, that the appropriation was not for sectarian purposes, but to pay for the support of the orphans placed in the institution by the state. The court, in closing its opinion, says: "The seventy-five dollars appropriated for each orphan is a contribution, and, should it be given, it will be used for the relief and support of a sectarian institution, and, in part at least, for sectarian purposes." And the writ was denied. In Cook Co. v. Industrial School, 125 Ill. 540, 18 N. E. Rep. 183, decided in 1888 by the supreme court of that state, the question was discussed and decided as to what constitutes "aid" to an institution under Section 3, Art. 8, of the Illinois constitution, which is as follows: "Neither the general assembly, nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation, or pay from any public fund whatever, anything in aid of any church or sectarian purpose,

or to help support or sustain any school, academy, seminary college, university, or other literary or scientific institution controlled by any church or sectarian denomination whatever; nor shall any grant or donation of land, money, or other personal property ever be made by the state, or any such public corporation, to any church, or for any sectarian purpose." By an act of the legislature of that state certain female infants were required to be committed to the Industrial School of Chicago. The industrial school seems to have been a corporation, but was conducted in connection with two institutions,—one known as "The House of the Good Shepherd," and the other as "St. Joseph's Orphan Asylum," both under the control of a sectarian organization. An action was brought by the industrial school to recover of Cook county some $15,000 for the care and support of the female infants committed to that institution under the law. The defense was that the industrial school had no real existence, but that the care and maintenance of those committed was furnished by the two institutions above named, and that the money, when collected, would go to them; and, as they were sectarian in character, the county was prohibited by the section of the constitution quoted from paying to them any public funds in aid of sectarian purposes. The court sustained the defense in a very able opinion delivered by Justice MAGRU-DER, in which he says: "It cannot be said that a contribution is no aid to an institution because such contribution is made in return for services or work done. A school is aided by the patronage of its pupils, even if they do pay for their tuition." It was contended in that case, as in the case at bar, that these institutions furnished tuition, clothing, care, etc., in return for the money received by them, and, as they earned what they received, and were not the recipients of any gift or donation, nothing was paid in aid of or to help support or sustain them. In discussing this proposition, the court says, on pages 570, 571, 125 Ill., and pages 197, 198, 18 N. E. Rep.: "If they are entitled to be paid out of the public funds, even though they are under the control of sectarian denominations, simply because they relieve the state of a burden which it would other-

wise be itself required to bear, then there is nothing to prevent all public education from becoming subjected, by hasty and unwise legislation, to sectarian influences. By Section 1 of Art. 8 of the constitution it is made the duty of the state to provide a thorough and efficient system of free schools. If statutes are passed, under which the management of these schools shall get into the hands of sectarian institutions, then, under the theory contended for, the prohibition of the constitution will be powerless to prevent the money of the tax payers from being used to support such institutions, inasmuch as they will render a service to the state by performing for it its duty of educating the children of the people. It is an untenable position that public funds may be paid out to help support sectarian schools, provided only such schools shall render a *quid pro quo* for the payments made to them. The constitution declares against the use of public funds to aid sectarian schools, independently of the question whether there is or is not a consideration furnished in return for the funds so used." Our attention was called by the learned counsel for plaintiff to Millard v. Board, 121 Ill. 297, 10 N. E. Rep. 669. But the decision in that case does not, we think, affect the case at bar, and it is commented on by the court in the Cook Co. Case as follows: "There is nothing in the doctrine here announced which consists with the case of Millard v. Board, 121 Ill. 297, 10 N. E. Rep. 669. There the proceeding was by an individual tax payer against a board of education, and a majority of the court sustained the act of the board, which had no school house, in temporarily leasing the basement of a Catholic church for the purpose of holding one of the public schools therein. But the board did not part with its control of the school. The scholars were taught by teachers whom the board appointed, and under a system of instruction which the board prescribed."

It is further contended by the counsel for plaintiff that by the provisions of the law and the regulations of the board of education the normal department in the Pierre University was a distinct and separate department, under the control of the board of education; and they call our attention to the regula-

tions, which provide that "the pupils of this department of the school shall be excused, if they desire, from any exercises where sectarian doctrines are taught, or any comment made upon the Scriptures;" that the territorial board shall prescribe the course of study in the normal department; and that the principal and all teachers in that department must be approved by the board of education, etc. But while, by these and other provisions in the law and the regulations, the board of education reserved to itself large powers in the control and management of this department, it nevertheless clearly appears that the teachers in this department were employed and selected by the plaintiff, subject to the approval of the board of education. They were paid by the plaintiff, and under the control of plaintiff as to all matters not especially reserved to the board of education. They constituted a part of the faculty of a sectarian school, and the funds claimed in this action are not to be be paid to such teachers specifically, but, if paid, will be received by the plaintiff, and used for its institution. The fact, therefore, that the purpose for which plaintiff was organ- ized and exists was and is generally to maintain and promulgate the doctrines and belief of one particular sect, constitutes the university under its control a sectarian school or institution, within the meaning of Section 3, Art. 6, and Section 16, Art. 8, of our state constitution; and the state is therefore prohibited from appropriating to it any of the public funds collected from taxes paid by the public and contributed by members of all the different religious sects of the state. We recognize fully the learning and ability of the faculty of the Pierre University, and the noble work in which they are engaged. We recogize also the faithfulness and fidelity with which the work of instruction was performed under its alleged contract with the board of education, but, with our views of the mandate of the constitution, we are compelled to deny to the plaintiff any relief against the state. Judgment must therefore be entered in favor of the defendant, and it is so ordered. All the judges concurring.