KNEIP, Appellant v. HERSETH, et al., Respondents

(214 N.W.2d 93)

(File No. 11348. Opinion filed January 9, 1974)

644

**Donald J. Porter, Martens, Goldsmith, May, Porter & Adam,** Pierre, for plaintiff and appellant.

**Samuel W. Masten,** Canton, for defendants and respondents.

ISSUE I

HALL, Circuit Judge.

On May 14, 1973, the plaintiff commenced a suit against the defendants under South Dakota's Declaratory Judgment Act (SDCL 21-24). Plaintiff Governor Kneip, an announced candi-

date for the 1974 Democrat nomination for Governor, sought to have SDCL 12-6-2 declared unconstitutional and inapplicable to him in the 1974 primary and general elections.

Both defendants moved to dismiss for lack of jurisdiction and for failure to state a claim upon which relief may be granted. In their answer, the defendants contended that they would comply with the Constitution and laws of South Dakota and that SDCL 12-6-2 is a constitutional statute which precludes the plaintiff from seeking nomination in the 1974 primary.

The trial court denied both motions of defendants to dismiss and for summary judgment. At trial, the court ruled that plaintiff could properly maintain his declaratory judgment action, but was otherwise precluded from seeking nomination in the 1974 primary because SDCL 12-6-2 was constitutional. The trial court denied plaintiff the relief sought; from this ruling, the plaintiff has appealed. Defendants have raised the question of the trial court's jurisdiction to grant a declaratory judgment.

The questions for decision on this appeal are thus clearly delineated.

South Dakota's Declaratory Judgment Act provides that its purpose is to "declare rights, status, and other legal relations". SDCL 21-24-1. This purpose may be accomplished by securing a declaration of the "construction or validity" of any instrument, statute, or ordinance if these affect the person seeking the declaration. SDCL 21-24-3; Torigian v. Saunders, 1959, 77 S.D. 610, 97 N.W.2d 586. To effectuate the purpose of this remedial declaratory judgment legislation, the courts are to interpret it with liberality. SDCL 21-24-14. Standard Casualty Co. v. Boyd, 1955, 75 S.D. 617, 71 N.W.2d 450.

The philosophy of the Declaratory Judgment Act establishes that through it the courts seek to enable parties to authoritatively settle their rights in advance of any invasion thereof. Danforth v. City of Yankton, 1946, 71 S.D. 406, 25 N.W.2d 50; Security State Bank v. Breen, 1938, 65 S.D. 640, 277 N.W. 497. The objective of the act is to prevent actual invasions

of rights and to establish guidelines for parties' actions so they may keep within lawful bounds, avoid expense, bitterness of feeling, the disturbance of orderly pursuits and to foster judicial economy. Merkel v. Long, 1962, 368 Mich. 1, 117 N.W.2d 130; Greene v. Wiese, 1955, 75 S.D. 515, 69 N.W.2d 325. Within the bounds of the remedial act's command of a liberal construction and liberal administration is found its ultimate goal of allowing " 'the courts [to be] more serviceable to the people.' " Nims v. Grand Trunk Western Ry. Co., 1949, 326 Mich. 371, 40 N.W.2d 188; Larkin v. Bontatibus, 1958, 145 Conn. 570, 145 A.2d 133. The achievement of peace through the avoidance of predictable conflict permeates as the Act's main function, Trossman v. Trossman, 1960, 24 Ill.App.2d 521, 165 N.E.2d 368.

■ However, the courts have established restrictions on the extent to which a declaratory judgment may be sought. The limits are achieved in the proscriptions that there must be a justiciable controversy between legally protected rights of parties whose interests are adverse. Greene v. Wiese, 1955, 75 S.D. 515, 69 N.W.2d 325; Danforth v. City of Yankton, 1946, 71 S.D. 406, 25 N.W.2d 50; Security State Bank v. Breen, 1938, 65 S.D. 640, 277 N.W. 497. So-called advisory opinions or the decisions of moot theoretical questions are normally not encouraged where the future shows no indication of the invasion of a right. Courts normally seek to avoid decisions involving future rights based upon contingencies which may or may not occur. Courts often require adverse claims, based upon present rather than speculative facts, which have ripened to a state of being capable of judicial adjustment. 22 Am.Jur.2d, Declaratory Judgments, § 26, at p. 871.

■ The liberality to be afforded the construction of the Declaratory Judgment Act, because of its remedial goals, should allow, however, the decision of present rights or status which are based upon future events when a good-faith controversy is brought before the courts. This appears particularly true when the construction of statutes dealing with zoning, taxation, voting or family relations presents matters involving the public interest in which timely relief is desirable. Amer. Ind. Party in Idaho, Inc. v. Cenarrusa, 1968, 92 Idaho 356, 442 P.2d 766; Benesch v.

Miller, 1968, Alaska, 446 P.2d 400; Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; Ervin v. Collins, 1956, Fla., 85 So.2d 852, 59 A.L.R.2d 706; Larkin v. Bontatibus, 1958, 145 Conn. 570, 145 A.2d 133; contra, Torigian v. Saunders, 1959, 77 S.D. 610, 97 N.W.2d 586; see, Dickson, Declaratory Remedies and Constitutional Change, 24 Vand.L.Rev. 257 (1971); Borchard, Declaratory Judgments, at p. 58 (2d Ed.1941).

In Ervin v. Collins, supra, the Florida Supreme Court allowed a declaratory judgment in a case similar to the one now brought by plaintiff Governor Kneip. Prior to the election process, the court ruled on Governor Collins' action to determine his eligibility for another term. The court felt this matter to be of such "public interest" as to demand a "more liberal" rule in regard to this type of declaratory judgment suit.

The case of Benesch v. Miller, supra, finds the Supreme Court of Alaska overruling the trial court's holding that Senator Gruening's declaratory judgment action was premature until after the election when it was determined if he had won. The court held that the statute itself, with nothing more, created an adverse interest which would allow Senator Gruening's suit, and that unless immediate pre-election relief was granted the "unequivocal wording of the statute will likely discourage potential Gruening supporters" and thus work an injustice to both Gruening, himself a voter, and other voters who may desire his candidacy. In Amer.Ind. Party in Idaho, Inc. v. Cenarrusa, supra, the Idaho court ruled that even though the Secretary of State had yet to be approached, the declaratory relief could be afforded in an election matter. The mere enactment of a statute imposing restraints on an individual and implying enforcement creates that justiciability to sustain a proceeding for declaratory judgment. 26 C.J.S. Declaratory Judgments § 45, p. 129.

These electoral cases achieve a common ground. They command affirmative relief against no one. They merely resolve the uncertainty surrounding a person's candidacy by determining his status at a timely point. They prevent the watering down of the voter franchise by explaining who could run before a vote was irretrievably lost. This is desirable because present voting rights often depend on a determination of future questions.

An example of the extent to which courts have gone in handling a matter which can only arise as the result of future conduct is found in Larkin v. Bontatibus, supra. There, the plaintiffs were taxpayers who were challenging a proposed creation of a new municipal district which may have built a sewer system to handle an adjoining area. If the sewer were built it would infringe upon plaintiffs' easements. The court held that plaintiffs' declaratory suit was brought in good faith based upon the municipality's efforts which, though contingent, appeared likely to occur. Thus, the court said, " 'The remedy by means of declaratory judgments is highly remedial, and the statute * * * should be accorded a liberal construction to carry out the purposes' " of the act. To " '[f]ully * * * carry out the purposes intended to be served by such judgments, it is sometimes necessary to determine rights which will arise or become complete only in the contingency of some future happening.' " Larkin v. Bontatibus, supra, at 145 A.2d 135-136. They were rightly desirous of the prevention of conflict by the settlement of rights or status in advance of any claimed invasion thereof or irreparable harm caused by uncertainty.

South Dakota's law dealing with declaratory judgments, as applied to construction of a statute, may appear to be in conflict with the previous cases. Torigian v. Saunders, 1959, 77 S.D. 610, 97 N.W.2d 586; Danforth v. City of Yankton, 1946, 71 S.D. 406, 25 N.W.2d 50. Review of the Danforth case indicates that the jurisdictional requirements are more restrictive when future contingencies are involved. A declaratory judgment was there denied by the court because the city had yet to decide whether it would buy a bridge, and because no matter how the case was decided plaintiff's taxes would not be changed. The opinion states there were no real adverse interests, thus no controversy, and the court should not give a mere advisory opinion. There are intimations that had the proposed city activity been such as to increase the taxpayer's taxes the suit would have been allowed even though the contingency of the bridge being purchased still existed. In the present case mere delay infringes upon plaintiff's voting rights.

The Danforth case stated the basic principles involved in a declaratory judgment. The recent years have, however, found a

liberalization of what constitutes adversely affected parties with interests which are entwined in a justiciable controversy. This is particularly true in matters dealing with civil rights, taxation, quasi-criminal legislation and the total electoral process (candidacy and voting). This so-called liberalization does not appear to be erroneous when a determination of present rights is achievable only by an interpretation which may, to some extent, involve future contingencies. As plaintiff Governor Kneip has pointed out, the United States Supreme Court does not deny a declaratory judgment in an action brought by voters previous to an election simply because they may not be turned away from the polls or may die before the election. This statement emphasizes the emptiness of voting rights if they cannot be interpreted before the election. Plaintiff, though a declared candidate, is also a voter who is desirous of voting in an election in which he can run.

Authority has been cited for the proposition that there is no justiciable controversy until the candidate has filed his petition for office or until he is nominated or elected. State v. Rosellini, 1960, 55 Wash. 2d 554, 348 P.2d 971; Talton v. Dickinson, 1954, 261 Ala. 11, 72 So.2d 723; Bryant v. Gray, 1954, Fla., 70 So.2d 581; Barber v. Circuit Court for Marathon County, 1922, 178 Wis. 468, 190 N.W. 563; 22 Am.Jur.2d, Declaratory Judgments, §§ 25, 26, 27, 35. These decisions, however, involve factual situations where there is either a manner, other than declaratory judgment, by which election statutes must be challenged or the parties seeking the judgment have no personal rights involved. In Bryant v. Gray, supra, the case upon which the defendants place heavy reliance, the only reason a declaratory judgment was not allowed was because the plaintiff had failed to allege he would be a candidate for the office of Governor in the challenged statute. Other than this, the case is factually similar to plaintiff Governor Kneip's.

The above cases fail to lend credence to the purposes which are to be achieved by the declaratory judgment statutes. They go to the extreme of demanding that the status quo be shattered by actual violation of rights before the court will act. This thrusts the Declaratory Judgment Act into a state of uselessness. The goal of the Act is clear. It seeks to avoid the painful and socially

undesirable violence and destruction which contribute nothing to the controversial nature of the issues involved. If the major premise of the Declaratory Judgment Act is to afford security and relief against uncertainty, attempting to avoid litigation which results from the destruction of peace, with a view toward declaring rights rather than executing them, then before they are infringed upon voting and candidacy rights or status should be determined. The transcendent importance we place upon the voting franchise and right to associate with others in a political party (Kusper v. Pontikes.* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260, Nov. 19, 1973) would seem to compel this result.

Where does the philosophy of the Declaratory Judgment Act place plaintiff Governor Kneip's suit against the Secretary of State? The mandate appears clear. Assuming that the Secretary of State is sworn to uphold the law and that there is a strong presumption that all legislation is constitutional, it then appears academic that the Secretary will refuse plaintiff Governor Kneip's petition for office. Only lawful petitions may be accepted, and the statute on its face presently prevents a Democrat or Republican from being a candidate for Governor in a primary election for more than two successive terms. This makes the interests of plaintiff and defendants adverse if we travel beyond the defendants' facade of indifference. The Secretary of State admitted she would uphold the statute as it presently stands and in the trial court she contended, and on appeal contends, that the statute, SDCL 12-6-2, bars plaintiff from seeking the office of Governor as a nominee of the Democrat party. This engenders a present controversy which, if left to become an actual violation of rights, will far exceed a mere difference of opinion.

█ With the existence of two of the four Danforth criteria, controversy and adverse interest, there must next be established the legal interest of the plaintiff and a ripeness for judicial determination. Kusper v. Pontikes, 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) reaffirms the importance of the right to vote and the right to associate with a political party of one's choice.

---

* It should be noted that this appeal was decided November 19, 1973, and so the trial court did not on August 14, 1973, have the benefit of this decision.

This association, to be effective, must occur before an election or primary. The right to vote for someone, even one's self, and the right to do so while associated with a political party are constitutionally protected rights.

The plaintiff is presently possessed of the above rights no less than any other voter. He is a declared candidate, and he seeks to effectuate these present rights by a declaratory judgment which can only make his association with a political party effective if established now. His right to associate with Democrat voters, and theirs with him, is presently debilitated because of the uncertainty created by statute which apparently denies this association. A legally protected right is clearly in jeopardy.

As the expert testimony establishes, to deny a candidate the benefit of the party machinery before the filing date is to greatly limit his political success. Thus, the right of political association is razed to a point of being ineffectual if this is allowed. To make plaintiff Governor Kneip wait until he has presented his petition for office before he can challenge the effect of a statute, which on its face denies him the right to associate with the Democrat party, is to deny the effectiveness of present rights and would destroy the justification for the creation of the Declaratory Judgment Act. It is obviously apparent that the seeds of controversy have ripened to a state demanding adjudication. The legal interest is in jeopardy and the courts should effectuate that interest in keeping with the purposes of the Declaratory Judgment Act.

The commands of the Danforth case have been met. Assuming the good faith of plaintiff in his declaration of candidacy and the presumptive assumptions of constitutionality which will command the Secretary of State to refuse plaintiff's petition if presented, a situation exists which should be solved by a declaratory judgment. Though present rights depend on the contingency of filing for office, a realistic approach, based upon plaintiff's good faith, reflects that conflict is imminent. This was recognized by the trial court which ruled the declaratory action valid.

The declaratory judgment is meant to afford security against uncertainty with a view toward avoiding litigation and settling rights before there has been an irrevocable change of position. 22 Am.Jur.2d, Declaratory Judgments, § 6, at p. 841. Our present law found in Danforth, which supports this purpose, would not be violated by a decision in favor of a declaratory judgment in this case. The purpose of the Declaratory Judgment Statute would be vindicated by such action, and the constitutionally intense nature of the electoral subject matter suggests it should be allowed. It therefore appears that to clear the cloud of uncertainty presently surrounding plaintiff's present rights, a declaratory judgment should be issued and the trial court affirmed in this regard.

## ISSUE II

FOSHEIM, Circuit Judge.

At the 1972 General Election, a new Article IV, entitled "EXECUTIVE DEPARTMENT", was adopted. The Article restricts the Governor to two consecutive terms. Prior thereto, the Constitution provided for two-year terms with no limitation on tenure; however, SDCL 12-6-2, enacted in 1947, prohibits a third successive nomination for Governor.

Since the new Article did not expressly repeal the old, we will first consider the effect of the revision.

The Joint Resolution of the Legislature, which submitted the Executive Article to the electors, provided:

"Section 2. That Article IV of the Constitution of the state of South Dakota be amended to read as follows:"

An amendment of a section "to read as follows:" repeals all of the section amended and not embraced in the amended form. People v. Hemphill, 1968, 96 Ill.App.2d 407, 238 N.E.2d 601; Johnston v. Hicks, 1969, 225 Ga. 576, 170 S.E.2d 410; Diamond v. Parkersberg-Aetna Corp., 1961, 146 W.Va. 543, 122 S.E.2d 436; State v. Hostetter, 1934, 336 Mo. 391, 79 S.W.2d 463.

▆▆ The explanatory statement of the Attorney General on the official ballot stated in part:

"This proposal replaces Article IV of the South Dakota Constitution relating to the Executive Department."

Even though an amendment does not expressly repeal a constitutional provision, yet, if it rewrites and covers the same subject provided for in such provision the amendment will supersede and be regarded as a substitute therefor. 16 C.J.S. Constitutional Law § 42, p. 132; In re Opinions of the Justices, 1933, 227 Ala. 296, 149 So. 781; Ream v. Wendt, 1966, 2 Ariz. App. 497, 410 P.2d 119.

▆▆ As to when a constitutional provision becomes operative depends on whether it is self-executing. State v. Burkhart, 1921, 44 S.D. 285, 183 N.W. 870. It is self-executing when no legislation is necessary to give it effect. State v. S.D. Rural Credits Bd., 1922, 45 S.D. 619, 189 N.W. 704; State v. Bradford, 1899, 12 S.D. 207, 80 N.W. 143, rehearing 1900, 13 S.D. 201, 83 N.W. 47; 16 Am.Jur.2d, Constitutional Law, § 94, p. 280; 16 C.J.S. Constitutional Law § 48, p. 142. It is a settled rule of constitutional construction that prohibitive and restrictive provisions are self-executing and may be enforced by the Court, independent of legislative action, unless it appears otherwise from the language of the provision and the circumstances of its adoption. State v. Bradford, 12 S.D. 207, 80 N.W. 143; 16 Am.Jur.2d, Constitutional Law, § 100, p. 284; 16 C.J.S. Constitutional Law § 49, p. 147.

▆▆ Guided by these rules of construction, we conclude that portion of Article IV § 2, which reads:

"Commencing with the 1974 general election, no person shall be elected to more than two consecutive terms as Governor or as lieutenant governor"

is prohibitive and restrictive. No legislation is needed for, or could aid, its implementation. It was self-executing and became

effective upon completion of the election process. When it took effect all related statutes, including SDCL 12-6-2, became subject to the new Constitutional Article.

The view we take renders it unnecessary to decide whether a person having served two successive, two-year terms could have sought the nomination of his party for Governor in any election after enactment of SDCL 12-6-2 in 1947, or whether he could do so in 1974, had the Constitution not been changed. Such fact questions involve different legal principles, since they would rest on a statute more restrictive than the Constitution. These are now abstract issues which this Court will not determine. State v. Davis, 1930, 59 N.D. 191, 229 N.W. 105; Rowe v. Stanley County, 1928, 52 S.D. 516, 219 N.W. 122; State v. Urban, 1932, 60 S.D. 614, 245 N.W. 474.

We are requested to declare whether plaintiff can seek the Democrat nomination for Governor in 1974. That must be decided by the law as it is in 1974. In making this determination, we should first view the present status of SDCL 12-6-2. This statute survived the adoption of the new Article IV if it is not repugnant thereto. Cutting v. Taylor, 1892, 3 S.D. 11, 51 N.W. 949; Remington v. Higgins, 1894, 6 S.D. 313, 60 N.W. 73; In re Nelson, 1902, 19 S.D. 214, 102 N.W. 885. Laws in force at the time of the adoption of a constitutional provision, and not inconsistent therewith, remain in force until changed by the Legislature. However, laws in conflict therewith are inoperative. Mannie v. Hatfield, 1908, 22 S.D. 475, 118 N.W. 817; Synod of Dakota v. State, 1891, 2 S.D. 366, 50 N.W. 632. Stated another way, if there is a conflict between a statute and a new constitutional provision, the statute is repealed by implication. 16 Am.Jur.2d, Constitutional Law, § 49, at p. 220. In making this determination, the Court will presume in favor of the constitutionality of the statute until the contrary clearly appears, Payne v. Jones, 1924, 47 S.D. 488, 199 N.W. 472; State v. Reeves, 1921, 44 S.D. 568, 184 N.W. 993; Application of Nelson, 1968, 83 S.D. 611, 163 N.W.2d 533; In Re Hinesley, 1967, 82 S.D. 552, 150 N.W.2d 834, and will, if possible, construe a statute as to render it valid. Spangler v. City of Mitchell, 1915, 35 S.D. 335, 152 N.W. 339; Bekker v. White River Valley Ry. Co., 1911,

28 S.D. 84, 132 N.W. 797; Kramar v. Bon Homme County, 1968, 83 S.D. 112, 155 N.W.2d 777; Matthews v. Linn, 1959, 78 S.D. 203, 99 N.W.2d 885; Haas v. Independent School Dist. No. 1 of Yankton, 1943, 69 S.D. 303, 9 N.W.2d 707. Any fatal conflict with the statute must appear beyond all reasonable doubt. Bon Homme County v. Berndt, 1902, 15 S.D. 494, 90 N.W. 147; Morrow v. Wipf, 1908, 22 S.D. 146, 115 N.W. 1121; Warren v. Brown, 1930, 57 S.D. 528, 234 N.W. 38; Great Northern Ry. Co. v. Graff, 1947, 71 S.D. 595, 28 N.W.2d 77; State v. Spink Hutterian Brethren, 1958, 77 S.D. 215, 90 N.W.2d 365.

SDCL 12-6-2 provides as follows:

"No person shall be *nominated* under the provisions of this chapter for election to the office of Governor for a third successive term." (Emphasis supplied)

Article IV § 2 of the Constitution provides in part as follows:

"no person shall be *elected* to more than two consecutive terms as Governor or as lieutenant governor." (Emphasis supplied)

The new Constitution provides that the term of the Governor is four years, and to apply a construction to SDCL 12-6-2 consistent with the Constitution it must be read as applying to a "third successive (four-year) term." As thus construed, SDCL 12-6-2 offers no impediment to Governor Kneip seeking nomination in the 1974 primary election.

It is the general rule, and settled law in South Dakota, that a constitutional provision should not be construed to have retroactive effect unless such intention is clearly expressed. Cutting v. Taylor, 1892, 3 S.D. 11, 51 N.W. 949; Kirby v. Western Union Tel. Co., 1893, 4 S.D. 105, 55 N.W. 759; Bahlkow v. Preston, 1932, 60 S.D. 151, 244 N.W. 93; Federal Deposit Ins. Corporation v. Ensteness, 1942, 68 S.D. 467, 4 N.W.2d 209; 16 C.J.S. Constitutional Law § 40, p. 121; 16 Am.Jur.2d, Constitutional Law, § 48, p. 218. A lucid statement of this rule was quoted by this Court in In Re Scott's Estate, 1965, 81 S.D. 231, 133 N.W.2d 1.

" 'It is always to be presumed that a law was intended, as its legitimate office, to furnish a rule of future action to be applied to cases arising subsequent to its enactment. A law is never to have retroactive effect unless its express letter or clearly manifested intention requires that it should have such effect. If all its language can be satisfied by giving it prospective operation, it should have such operation only.' "

Though the 1972 amendment to Article IV, § 2, does create a qualifying limitation that "[c]ommencing with the 1974 general election, no person shall be elected to more than two consecutive terms as Governor or as lieutenant governor", its operation is prospective. Such limitation is to apply only to those elected "[c]ommencing with the 1974 general election". The Court presumes the people adopted this constitutional provision in view of and with an understanding of the prior existing law and thus inserted the restriction on consecutive terms prospectively to change the prior lack of such limitation. Richardson v. Hare, 1968, 381 Mich. 304, 160 N.W.2d 883; Kayden Industries, Inc. v. Murphy, 1967, 34 Wis.2d 718, 150 N.W.2d 447; In Re Wisser v. Gabler, 1966, 5 Ohio St.2d 89, 214 N.E.2d 92. The word "commence" is defined as being the beginning; the performance of the first act of; the entrance upon; the origination of or the doing of the first act in regard to any activity. Alaska Mines & Minerals, Inc. v. Alaska Industrial Bd., 1960, Alaska, 354 P.2d 376, 379; State v. Packard, 1952, 122 Utah 369, 250 P.2d 561, 562. The term "shall be" is understood to be prospective in meaning, emphasizing change in the law and as not embracing events which have already occurred. Cassan v. Fern, 1954, 33 N.J.Super. 96, 109 A.2d 482, 485; Jones v. Jones, 1966, 51 Misc.2d 610, 273 N.Y.S.2d 661, 668.

The framers of the Constitution use words in their natural sense and fully intend what they say. Schomer v. Scott, 1937, 65 S.D. 353, 274 N.W. 556. The words used in the 1972 amendment to Article IV, § 2, were clearly explicit. When words such as these are clear and unambiguous, they are to be given their natural, usual meaning and are to be understood in the sense in which they are popularly employed. Levasseur v.

Wheeldon, 1962, 79 S.D. 442, 112 N.W.2d 894; Boe v. Foss, 1956, 76 S.D. 295, 77 N.W.2d 1; Bandy v. Michelson, 1950, 73 S.D. 485, 44 N.W.2d 341. No wordage should be found to be surplus. No provision can be left without meaning. Read v. Jerauld County, 1945, 70 S.D. 298, 17 N.W.2d 269. Had the people intended the constitutional amendment to apply to and limit plaintiff Kneip, they could have easily accomplished this by merely deleting the words "[c]ommencing with the 1974 general election". See, State ex rel. Rhodes v. Brown, 1973, 34 Ohio St.2d 101, 296 N.E.2d 538, which achieved the same holding under similar circumstances. The amendment without the above-quoted phrase would have precluded everyone from serving more than two consecutive terms at any time.

▮ Accordingly, it has been held that a constitutional prohibition against the re-election of public officers applies only to future elections and does not affect those holding office at the time the new Constitution took effect. State v. Giles, 1849, 2 Pin. (Wis.) 166; 16 Am.Jur.2d, Constitutional Law § 48, footnote 14, p. 219.

▮ Likewise, a constitutional amendment shortening the term of office of a constitutional officer will not be held retrospective in its operation unless the terms of the constitutional amendment clearly disclose an intention to make it so. State v. Light, 1938, 68 N.D. 513, 281 N.W. 777; Hopkins v. Anderson, 1933, 218 Cal. 62, 21 P.2d 560; City of Shreveport v. Cole, 1889, 129 U.S. 36, 9 S.Ct. 210, 32 L.Ed. 589. A constitutional provision that " 'sheriffs shall hold no other office, and be ineligible for two years next succeeding the termination of their offices' ", has been held prospective only, and not to render ineligible for another election persons in office at the time of the adoption of the Constitution. 16 C.J.S. Constitutional Law § 40, p. 121 at 124.

▮ It is ordered that that part of the judgment of the circuit court denying relief requested by plaintiff and dismissing the action is reversed and the action is remanded with direction to the circuit court to enter judgment that SDCL 12-6-2 is inapplicable and no bar to plaintiff's right to seek the guberna-

torial nomination of the Democrat party in the 1974 primary election. It is further ordered that the circuit court shall retain jurisdiction to enter such necessary and proper orders thereafter to carry out and enforce such judgment.

BIEGELMEIER, C. J., DOYLE, J., and FOSHEIM, Circuit Judge, concur in ISSUE I.

WINANS, J., concurs in result in ISSUE I.

BIEGELMEIER, C. J., DOYLE, J., and HALL, Circuit Judge, concur in ISSUE II.

WINANS, J., dissents in ISSUE II.

HALL, Circuit Judge, sitting for WOLLMAN, J., disqualified.

FOSHEIM, Circuit Judge, sitting for DUNN, J., disqualified.

BIEGELMEIER, Chief Justice (concurring).

· I concur in both the opinions of Judges Hall and Fosheim, yet add these comments. Judge Hall's opinion on Issue I assumes the standards or "commands" of Danforth v. City of Yankton, 71 S.D. 406, 25 N.W.2d 50, and, stating they have been met, approves and affirms the action of the circuit court in proceeding to the merits. I agree that those commands have been met and approve Judge Hall's opinion, but I desire to comment on the Danforth opinion, as I believe it misconstrued the scope of the Uniform Declaratory Judgments Act (herein referred to as Act) and fixed greater limits for granting the relief than those intended by that Act. A statement of the situation then before the Court is pertinent. There, a statute ·authorized a city to purchase and operate a toll bridge and issue bonds for the purchase price. All proceedings leading to its purchase and authorizing the issuance of bonds were complied with, yet the city commissioners decided not to complete the transaction until it had been adjudicated that the statute and proceeding were valid.

Plaintiff's action against the city and its officials resulted in a decree so declaring, and the defendants appealed. Stating the general rule to be that the defendant city and its officials, who were appellants, must not only have an interest in the subject matter of the controversy (which they did) but must be prejudiced or aggrieved by the decision from which they appealed, the court nevertheless assumed jurisdiction of the appeal instead of dismissing it and proceeded to inquire as to the jurisdiction of the trial court to grant the relief it did. After writing

> "It may be admitted that a resident taxpayer has a sufficient interest under the Declaratory Judgment Law to test the constitutionality of a statute under which taxing authorities will proceed to levy taxes or make expenditures of public money"

the Court held the actions of defendants could "in no way increase the burden of taxation * * * [and] plaintiff cannot possibly be affected as a taxpayer." That was one of the issues the circuit court was asked to determine—whether the bonds would "create a debt" of the city or whether they would be payable *only* out of the revenue, i.e., tolls collected from the operation of the bridge. The Court's opinion referred to the rights of parties to "mandamus or other remedial writs" that apply to those special proceedings to limit the application of the Act.

Lest it be said the writer was one of counsel for defendants in the Danforth action (which is true) and therefore would not impartially view that decision or opinion, let us turn to the actions of this Court itself. The Danforth opinion was decided November 18, 1946; within 23 days thereafter, on December 11, 1946, the Court had commendably granted permission to commence an original proceeding therein to prevent or restrain the city from taking any further action with reference to the purchase of the bridge, heard oral arguments and handed down a unanimous opinion (Mettet v. City of Yankton, 71 S.D. 435, 25 N.W.2d 460) determining all the questions raised and attempted to be raised in the Danforth action. The purpose of the Act was to correct such circumvention, procrastination and resulting

delay. It should be liberally construed. 22 Am.Jur.2d, Declaratory Judgments, § 8; 26 C.J.S. Declaratory Judgments § 9. The result reached in the Danforth opinion did not further, and is not in accord with the purposes of that Act and should not be accepted as being present authority for the apparent limitations it places on the application of that Act.

On Issue II, as to the opinion of Judge Fosheim on the merits, it is of interest that while the original Article IV, § 2 fixed the qualifications of the Governor as a citizen of the United States and a qualified elector of South Dakota, it also required a minimum age of 30 years and a residency of two years in this state; the present Article IV, § 2, retains the two-year residency requirement, but does not fix a minimum age. Even the word "elector" in the original § 2 does not appear in the present section.

At the time SDCL 12-6-2, which prohibits the nomination of a person for election to the office of Governor for a third successive term, was enacted, the Constitution provided the "Governor * * * shall hold his office for two years". Article IV, § 1. Thus, by its wording, it appears that SDCL 12-6-2 barred nomination by a political party in a primary for a third successive term, thereby creating a limitation of four successive years. The term of office for Governor has now been extended to four years by the constitutional provision, so that by it a person may constitutionally serve eight consecutive or successive years. It appears to me that it would be an anomaly to hold that SDCL 12-6-2 (passed in 1947), limiting the nomination for Governor to two successive terms, which were constitutionally set at two years, or a total of four years, would apply to and limit a 1972 constitutional provision permitting the election of a Governor for two consecutive terms of four years each.

I am in agreement with the thesis that the present Article IV, § 2, has no retroactive effect. It speaks only of and as to the four-year term it creates, so that in effect it reads in part: "Commencing with the 1974 general election, no person shall be elected to more than two consecutive (four-year) terms as Governor". Had plaintiff been elected in 1972 for the first time

for the old two-year term, and elected for a four-year term in 1974, it could not be soundly contended that the present Constitution bars him from election for a second four-year term in 1978. The limitation of two successive, four-year terms is a limitation "[c]ommencing with the 1974 general election".

WINANS, Justice (dissenting).

I concur in the Court's holding that the plaintiff is entitled to a declaratory judgment, and the requisite jurisdiction exists for the plaintiff to maintain this action. In this regard I agree with the trial court in its citation of Ervin v. Collins, 1956, Fla., 85 So.2d 852, in which the court there says, "When the public interest is involved a more liberal rule governs who may appropriately bring an action of this kind and prosecute it to this court, if need be." I believe the public interest doctrine is fulfilled because whatever concerns the office of Governor is of public interest.

The other issue before this Court to which we must address ourselves is the constitutionality of SDCL 12-6-2. This statute read as follows:

> "No person shall be nominated under the provisions
> of this chapter for election to the office of Governor for
> a third successive term."

This provision was added to SDC 1939, 16.0208, by the Session Laws of 1947, Ch. 84, § 1, and has continued as the statutory law since that date, even though the attempt to repeal has been made. The only office in the State of South Dakota presently covered by the prohibitions of this statute is that held by the plaintiff.

The right to nominate is vested in the legal voters of the state, a right which they cannot be deprived of by the Legislature. 25 Am.Jur.2d, Elections, § 128, p. 814; People v. Brady, 302 Ill. 576, 135 N.E. 87; State ex rel. Mills v. Stewart, 64 Mont. 453, 210 P. 465. The above statute, expressing the will of the legislative body of the state, does not deprive the legal

voters of this state from nominating the plaintiff as an independent candidate. Such statute limits itself to nominations and primary elections under the provisions of SDCL 12-6 and such nominations are referred to in that chapter as party nominations. The Code also provides in SDCL 12-7 that candidates for public office may be nominated otherwise than by primary elections and provides how this may be done.

That one method of securing a nomination may provide additional difficulties for a prospective candidate than some other method, or in some instances may be advantageous because voters of the opposite party may favor the candidate over their own party candidate, or even because a prospective candidate may feel more at home in seeking the nomination of the voters of his own political persuasion are all legitimate concerns of the plaintiff, but that cannot be any concern of the Court. Neither are they a proper test of its constitutionality where the method provided by the Legislature is reasonably appropriate to preserve the integrity of the nominating process. It is to this last concern, namely, the integrity of the nominating process, that this dissenting opinion is directed.

In 29 C.J.S. Elections, page 377, the headnote under § 130 reads as follows:

"The right to become a candidate for election to public office is a valuable and fundamental right. The legislature may, however, prescribe the qualifications of a person who desires to become a candidate for office, but provisions in that regard must be reasonable and not in conflict with any constitutional provision. A candidate must possess the statutory qualifications and electors cannot nominate as a candidate one who is disqualified to accept the nomination."

This headnote is amply supported by the authorities cited therein.

Originally nominees for public office were designated by self-appointed individuals. The system was early succeeded by party conventions and because of public dissatisfaction with the

political manipulations of conventions, they have been largely succeeded by direct party primaries. Ray v. Blair, 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894.

Nomination of candidates for public office is regulated and controlled by statute in a majority of the jurisdictions. Mairs v. Peters, Fla., 52 So.2d 793; People ex rel. Kell v. Kramer, 328 Ill. 512, 160 N.E. 60. It is generally conceded that even in the absence of constitutional authorization the Legislature may invoke measures reasonably appropriate to secure the integrity of the nominating process in the exercise of police power and in so doing it does not unduly interfere with the freedom and equality of elections or the constitutional right of suffrage. 25 Am.Jur.2d, Elections, § 130, pp. 816-17. "* * * most attempts to invoke the guaranties of the privileges and immunities, due process, and equal protection clauses of the Fourteenth Amendment to the Federal Constitution against state action which assertedly interfered with an individual's nomination for or election to a state office have been unsuccessful." Id. § 131. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, reh. den., 321 U.S. 804, 64 S.Ct. 778, 88 L.Ed. 1090. Annotations 11 L.Ed.2d 1063, 23 L.Ed.2d 78.

If a statute requires that a candidate possess specified qualifications as a prerequisite to nomination, he must possess those qualifications at the time of his nomination. State ex rel. Brewer v. Wilson, 151 W.Va. 113, 150 S.E.2d 592.

There is in the case at bar no constitutional question involved, either of the State of South Dakota or of the United States of America. The right to be declared the nominee of a party to a certain office is not the right to an office or a franchise nor is it a constitutional right. Bradley v. Board of State Canvassers, 154 Mich. 274, 117 N.W. 649.

"Eligibility to hold the office must depend upon whether the candidate claiming to have been elected to it possesses the constitutional qualifications if the office be one created by the Constitution, or the statutory qualifications if it be one created by statute, * * * But whether one is eligible to run for office as the

nominee of a party by getting his name on the ballot at a regular election, under its device, depends upon whether he possesses the political qualifications and party affiliation prescribed by the primary election law, entitling him to become its nominee; and this is true whether his nomination is secured through the voters of the party in a primary election or its committee in filling a vacancy." Francis v. Sturgill, 163 Ky. 650, 174 S.W. 753.

The right of one to become a candidate in a primary election for nomination by a political party is created by statute, or by party rules and regulations, and can be exercised only on the conditions prescribed. State ex rel. Denny v. Members of Caddo Parish, Democratic Executive Committee, 201 La. 483, 9 So.2d 657; Roberts v. Cleveland, 48 N.M. 226, 149 P.2d 120, 153 A.L.R. 635. If one cannot fill the requirements so as to be the candidate of the political party of his choice, he may still be a candidate at the general election by independent petition or by "write-in". Preisler v. City of St. Louis, Mo., 322 S.W.2d 748; Cole v. Tucker, 164 Mass. 486, 41 N.E. 681; City of Jackson v. State, 102 Miss. 663, 59 So. 873; De Walt v. Bartley, 146 Pa. 529, 24 A. 185.

It has also been held to the effect that the Legislature has power to prescribe qualifications for holding office in addition to those prescribed by the Constitution, provided they are reasonable and not opposed to the Constitution, and holding that the statutory qualification that one must be a qualified elector at the time of filing his notification and declaration to become a candidate in a primary election for nomination as a candidate of his party for a member of the house of representatives does not conflict with the constitutional requirement that members of the house of representatives must be at least 21 years of age at the time of their election. Stafford v. State Election Board, 203 Okl. 132, 218 P.2d 617.

The appellant contends that SDCL 12-6-2 was an unconstitutional enactment when adopted by the Legislature and also is unconstitutional under the amendment to the Constitution adopted in 1972. The Constitution when SDCL 12-6-2 was enacted provided:

"No person shall be eligible to the office of Governor or lieutenant governor except a citizen of the United States and a qualified elector of the state, who shall have attained the age of thirty years, and who shall have resided two years next preceding the election within the state or territory; nor shall he be eligible to any other office during the term for which he shall have been elected."

And the present Constitution now provides:

"The Governor and lieutenant governor must be citizens of the United States and residents of the state of South Dakota for two years preceding their election. They shall be jointly elected for a term of four years at a general election held in a non-presidential election year. The candidates having the highest number of votes cast jointly for them shall be elected. Commencing with the 1974 general election, no person shall be elected to more than two consecutive terms as Governor or as lieutenant governor. The election procedure shall be as prescribed by law."

There is no conflict in the constitutional provisions with the statute. The constitutional provision has to do with the qualifications of the person elected to the office of Governor. Without such qualifications he would not be eligible to hold the office of Governor, but eligibility for nomination by a particular political party may require its own qualifications. Of course they cannot be repugnant to the Constitution and they are not. They are simply a part of the primary procedure which may be considered a part of the election process or procedure "prescribed by law".

25 Am.Jur.2d, Elections, § 174, states:

"Every eligible person has the right under a constitutional guarantee of free and open elections to become a candidate for public office. As a general rule, one is eligible if he has the qualifications to fill the office for which he seeks to be a candidate. It does not necessarily follow, however, that he can be a candidate of a particular political party."

Again, this Court in State ex rel. Howells v. Metcalf, 18 S.D. 393, 100 N.W. 923, held:

> "To what extent, if at all, the rights of organized political parties should be recognized and regulated by law, is a matter of public policy, to be determined by the legislative department; a matter which does not concern this court. Its duty is done when it gives effect to the legislative will as expressed in statutes which do not conflict with any provision of the federal or state Constitution."

And in Healey v. Wipf, 22 S.D. 343, 117 N.W. 521, the Court stated:

> "In considering legislation relating to the regulation of party nominations great care should be taken to discriminate between preconceived notions regarding the wisdom of such regulations and the application of constitutional limitations upon the legislative power. The elective franchise is not a natural right. It is a privilege which may be taken away by the power which conferred it; and the only limitations upon the power of the Legislature to regulate its exercise and enjoyment are the express and implied limitations found in the federal and state Constitutions."

And as set out in 59 A.L.R.2d 719, the law is:

> "The purpose of a limitation against eligibility for continued re-election to the same office would appear to be to avoid the temptation to use the office improperly in an effort to sustain tenure. Not only is the idea of intrenchment in office repugnant to the national concept that no one has an inherent right to office, but the possibility of corruption in particular offices has inspired constitutional and statutory measures of prevention which have been recognized by the courts."

Appellant's position is and has been consistently throughout this proceeding that SDCL 12-6-2 has added another dimension to the qualifications set forth in the Constitution relating to his particular office. I have shown that this is not true inasmuch as the Constitution does not address itself to primary elections. This is an important distinction but for fear some may believe it highly technical rather than logical, I would point out that the various constitutional provisions do not in any way mention the primary election nor the need for petitions nor the number of signers on petitions, nor various other reservations and limitations, which reservations and limitations might be considered a qualification limiting one's right to run for the office of Governor. This is especially true of the constitutional provisions prior to the amended Constitution of 1972 pertaining to the office of Governor, which amended Constitution contains at the last line the following: "The election procedure shall be as prescribed by law." Prior to the time of this amendment such words were not contained in any constitutional provisions which pertained to the Governor's qualifications and yet, one would not argue very seriously that the primary qualifications and disqualifications were unconstitutional because they provided for qualifications such as one person securing the highest number of the votes or a certain percentage of the total votes before he could be the party nominee.

These qualifications were not covered by the Constitution until at least its latest amendment in 1972. I also point out that because it has been amended by containing the words "the election procedure shall be as prescribed by law", there is now even more reason to sustain the constitutionality of SDCL 12-6-2 than ever before. It has been constitutional since its very enactment in 1947.

In Maloney v. Kirk, Fla., 212 So.2d 609, the court said:

"It is elementary that the legislature may enact any statute not forbidden by the state or federal Constitution. But necessarily implied prohibitions are as binding as those expressed in specific language."

The law in South Dakota is to the same effect. The statute is not forbidden by the state or federal Constitution nor by any necessarily implied prohibition. It is valid and relates only to party nominations as opposed to the qualification of a person holding the office of Governor.

As to the eligibility and qualification of plaintiff, I would not hold that he cannot be a candidate, but what I do hold is that he is barred from being nominated by the Democrat party or any party, as provided by SDCL 12-6-2.

I would affirm the lower court's holding and, consequently, I dissent from this Court's holding to the contrary.