Doug CUMMINGS, John Kabeiseman
and Roger Andal, Applicants,

v.

George MICKELSON, in his official ca-
pacity as Governor of the State of
South Dakota, Glen A. Severson, Kath-
leen K. Caldwell, Respondents.

No. 18162.

Supreme Court of South Dakota.

Argued Jan. 12, 1993.

Decided Jan. 28, 1993.

Doug Cummings, Sioux Falls, for applicants.

Mark Barnett, Atty. Gen., Pierre, for respondent Governor Mickelson.

Charles M. Thompson of May, Adam, Gerdes and Thompson, Pierre, for respondents Severson and Caldwell.

GILBERTSON, Circuit Judge.

## INTRODUCTION

Applicants Cummings, Kabeiseman and Andal (hereinafter Applicants) challenge the authority of the Governor of the State of South Dakota, George S. Mickelson, to appoint two attorneys to the positions of Circuit Court Judge. The basis for this challenge is the question of when a person receiving such an appointment must establish his or her residency within the judicial circuit to which he or she is appointed as required by Art. V, § 6 of the South Dakota Constitution.

## ISSUES PRESENTED

### I.

Should a writ of prohibition be denied when the acts sought to be prohibited by the Governor have already occurred?

### II.

Should a writ of prohibition be denied in that the Applicants purportedly have a plain, speedy and adequate remedy in quo warranto?

### III.

Must appointees to the position of Circuit Court Judge be voting residents of his or her circuit at the time of application for appointment or prior to his or her assuming office?

## FACTS AND PROCEDURE

The Applicants seek to have this Court exercise its constitutional authority to issue a writ of prohibition against Governor Mickelson concerning circuit court judicial vacancies in the First Judicial Circuit and the Second Judicial Circuit. These vacancies were created by the retirement of the Honorable E.W. Hertz of the First Judicial Circuit on December 20, 1992, and the Honorable Robert Heege of the Second Judicial Circuit on January 5, 1993.

Upon notification to the Governor of a judicial vacancy, the Governor is empowered, pursuant to Art. V, § 7 of the South Dakota Constitution, to fill the vacancy by appointment for the balance of the term. The current term for all circuit court judges in South Dakota will expire in January of 1999.

Applications were received and reviewed by the Judicial Qualifications Commission. The Commission forwarded names of applicants it certified to be qualified for appointment to the Governor.

On November 20, 1992, Governor Mickelson announced he would appoint Glen A. Severson of Huron, South Dakota to the Second Judicial Circuit Court vacancy.[1] Huron is in the Third Judicial Circuit.

On the same day, the Governor also announced he would appoint Mark F. Marshall of Rapid City, South Dakota to fill the vacancy in the First Judicial Circuit.[2] Rapid City is in the Seventh Judicial Circuit. Mr. Marshall subsequently declined the appointment. Thereafter on December 7, 1992, Governor Mickelson announced his intention to appoint Kathleen K. Caldwell of Sioux Falls, South Dakota to fill the vacancy in the First Judicial Circuit. Sioux Falls is in the Second Judicial Circuit.

Governor Mickelson filed written appointments with the South Dakota Secretary of State on December 11, 1992. These appointments are to take effect on February 1, 1993.

On December 10, 1992, the Applicants filed with this Court an application requesting this Court to exercise its original jurisdiction and issue a writ of prohibition against the Governor's appointments. Applicant Douglas Cummings is an attorney from Sioux Falls and unsuccessfully sought the judicial vacancy in the Second Judicial Circuit. Applicant Andal is a resident of Minnehaha County. Applicant Kabeiseman is an attorney from Yankton in the First Judicial Circuit.

On December 11, 1992, the South Dakota Attorney General, on behalf of the Governor, filed a brief with this Court arguing the writ sought by the Applicants should be denied as prohibition cannot be used to challenge the right to hold public office and the actions of the Governor are now complete, thus making any claim for relief against him moot.

On December 21, 1992, this Court determined that Caldwell and Severson were indispensable real parties in interest to this proceeding and ordered them joined along with the Governor, as Respondents.

Due to the fact the appointments were scheduled to take effect on February 1, 1993, this Court accelerated its normal briefing and oral argument schedule to determine this question of public importance.

## ISSUE I

**SHOULD THE WRIT OF PROHIBITION BE DENIED AS MOOT SINCE THE ACTS SOUGHT TO BE PROHIBITED HAVE ALREADY OCCURRED?**

 A writ of prohibition is an extraordinary remedy. *S.D. Bd. of Regents v. Heege*, 428 N.W.2d 535, 537 (S.D.1988). It may issue upon a showing that a public officer is acting or is about to act without or in excess of his jurisdiction, or without or in excess of the authority conferred by law. SDCL 21–30–1. It may be issued in a direct application to this Court in appropriate circumstances. Art. V, § 5 of the South Dakota Constitution; *Heege, supra.*

It is required that an applicant for a writ of prohibition must show that he or she has no "plain, speedy and adequate remedy in the ordinary course of law" available to them. SDCL 21–30–2. *Corbly v. Matheson*, 335 N.W.2d 347, 348 (S.D.1983). If there is another "plain, speedy and adequate" remedy at law or in equity, equally available to an applicant, this Court has held it will not issue a writ of prohibition. *Brandon Savings Bank v. Swanson*, 54 S.D. 95, 222 N.W. 660, 661 (1928); *Gilmore v. Sandy*, 50 S.D. 247, 209 N.W. 342 (1926).

The Governor has the legal authority to fill the vacancies pursuant to Art. V, § 7 of

---

**1.** Pursuant to SDCL 16–5–1.2(2), the Second Judicial Circuit consists of Minnehaha County

**2.** Pursuant to SDCL 16–5–1.2(1) the First Judicial Circuit consists of Bon Homme, Charles Mix, Clay, Douglas, Hutchinson, Lincoln, Turner, Union and Yankton counties.

the South Dakota Constitution. He states that he has done so and that there remain no acts on his part for this Court to prohibit.[3] He argues that once Severson and Caldwell qualify for office pursuant to SDCL 3–4–7, they will become judges on February 1, 1993, pursuant to their appointment.[4]

In *State ex rel. Hellier v. Vincent*, 20 S.D. 90, 104 N.W. 914 (1905) this Court determined that once an appointment is made by the appropriate authority, it is final or exhausted and cannot be withdrawn and exercised again unless a subsequent vacancy arises. In *Burke v. Schmidt*, 86 S.D. 71, 191 N.W.2d 281, 284 (1971) we noted that this doctrine specifically applies to circuit court appointments by the Governor pursuant to what is now Art. V, § 7 of our Constitution and its statutory counterpart, SDCL 3–4–3.

This Court has generally held that it will not issue a writ of prohibition where the public official has already completed the acts sought to be prohibited.

> The case before us is one in prohibition.... The thing sought to be prohibited has been done, and cannot be undone by any order of court.... Any adjudication which this court might make would be only an ineffectual decision of the question whether or not these petitioners were wronged by what has been fully accomplished. Under those circumstances there is nothing but a moot case remaining, and the motion to dismiss must be sustained.

*Williamson v. Herseth*, 78 S.D. 476, 477, 104 N.W.2d 473 (1960), *quoting Jones v. Montague*, 194 U.S. 147, 153, 24 S.Ct. 611, 612, 48 L.Ed. 913 (1904). *See also Sioux Falls Argus Leader v. Young*, 455 N.W.2d 864, 867–8 (S.D.1990); *Church of Scientology v. U.S.*, — U.S. —, —, 113 S.Ct. 447, 449, 121 L.Ed.2d 313, 319 (1992).

■ However, as noted in *Young, supra*, and prior cases, this Court has not applied the mootness doctrine in exceptional circumstances. The basis for this exception is:

> The decision as to whether to retain a moot case in order to pass on a question of public interest lies in the discretion of the court and generally a court will determine a moot question of public importance if it feels that the value of its determination as a precedent is sufficient to overcome the rule against considering moot questions.

*Wheeldon v. Madison*, 374 N.W.2d 367, 378 (S.D.1985), *quoting Stanley County School v. Stanley County Ed. Ass'n*, 310 N.W.2d 162, 163 (S.D.1981). To invoke this public interest exception, three criteria must be met: (1) a general public importance; (2) probable future recurrence; and (3) probable future mootness. *Young, supra*, 455 N.W.2d at 868 n. 2; *Sedlacek v. S.D. Teener Baseball Program*, 437 N.W.2d 866, 868 (S.D.1989).

■ The issue before this Court is a question of general public importance. On February 1, 1993, Severson and Caldwell will begin to preside, along with their judicial colleagues, over two judicial circuits which contain nearly one-third of the state's population. The power which the people of this state have entrusted to a circuit court judge affects the people's lives, welfare and property to no small extent.

The second criteria is probable future recurrence. We take judicial notice that similar appointments have been made in the past. There is no reason to believe that they will not occur again. The Governor, by vigorously denying he has acted improp-

---

3. SDCL 3–4–6 sets forth the requirements for such appointments. They must be in writing and filed with the Secretary of State. The Court file shows this was done on December 11, 1992, when the appointments of Severson and Caldwell were filed with the South Dakota Secretary of State.

4. Qualifications for office required by SDCL 3–4–7 are set forth in SDCL 3–1 and 3–5. None of the requirements of those two chapters give any authority or power to the Governor concerning the qualification process after he makes his appointment and files it with the Secretary of State.

erly, is clearly reserving his right to proceed in the same manner in the future.

The third criteria is probability of future mootness. The Applicants are in a Catch 22 situation. They do not know the Governor's choices until his selections are publicly announced. Simultaneously the Governor can file the appropriate papers with the Secretary of State, thus always making his actions moot by the time his choices are made public.

We conclude that the public interest exception applies and we are prepared to address the issue of residency on the merits despite the fact that as to the appointments of Severson and Caldwell, the Governor's actions are moot.[5]

### ISSUE II

SHOULD THE WRIT OF PROHIBITION BE DENIED SINCE THE APPLICANTS PURPORTEDLY HAVE A PLAIN, SPEEDY AND ADEQUATE REMEDY IN THE FORM OF QUO WARRANTO?

The Governor argues that the Applicants have a plain, speedy and adequate remedy at law by an action in quo warranto brought under the authority of SDCL 21–28. This Court did hold in *State ex rel. Walkin v. Shanks*, 25 S.D. 55, 125 N.W. 122, 123 (1910) that quo warranto, rather than prohibition, is the proper method of determining the issue of title to public office. *See also State ex rel. Pryor v. Axness*, 31 S.D. 125, 139 N.W. 791 (1913); *Gibbs v. Bergh*, 51 S.D. 432, 214 N.W. 838 (1927); *Burns v. Kurtenback*, 327 N.W.2d 636 (S.D.1982); *State ex rel. Rearick v. Bd. of Comr's of Lyman County*, 34 S.D. 256, 145 N.W. 548 (1914) (mandamus rejected in favor of quo warranto). In *State ex rel. McGee v. Gardner*, 3 S.D. 553, 54 N.W. 606 (1893) quo warranto was used to determine the title to the office of circuit judge.

However, other decisions of this Court show that this general rule has not always received uniform application and support in

cases of this general factual setting. Initially, it should be noted that this Court early on in its existence made it clear that judicial discretion, rather than any fixed claims of right, were to govern the issuance of original writs of mandamus, prohibition, quo warranto, habeas corpus, injunction and certiorari:

> It is not easy, if indeed it would be advisable to define definitely all the cases or classes of cases in which this court will exert its original powers. These must rest, as the constitution has left them, in the sound discretion of this court, to be exercised or denied as the circumstances of the given case may demand.

*Everitt v. Bd. of County Commissioners, Hughes County*, 1 S.D. 365, 370, 47 N.W. 296, 298 (1890).

In *Putnam v. Phyle*, 57 S.D. 250, 232 N.W. 20 (1930) the plaintiff sued the Secretary of State to have her enjoined from certifying an independent candidate for Governor. We noted that such an action should have properly been brought as a request for a writ of prohibition rather than an injunction. Instead of dismissing on this point, we held that given the public importance of the case and the "need of prompt and final action," we would not "sacrifice substance to form" and would decide the case on the merits in favor of the plaintiff. 57 S.D. at 255, 259, 232 N.W. at 22, 24.

Subsequently in *State ex rel. Roberts v. Morrison*, 64 S.D. 516, 268 N.W. 647 (1936) a member of this Court seeking re-election sought a writ of prohibition from this Court against the Secretary of State on the grounds that his opponent did not have enough valid signatures on his nominating petition. This Court found that prohibition was the "proper remedy" under which to examine the legality of the nominating petition. 64 S.D. at 522, 268 N.W. at 650. *See*

---

**5.** As Caldwell and Severson have not taken their oath and thus assumed office, clearly the claim

of the Applicants against them is not moot.

*also Vine v. Jones,* 13 S.D. 54, 82 N.W. 82 (1900); *State ex rel. Bakewell v. Hansen,* 67 S.D. 499, 294 N.W. 445, 446 (1940); *In re Opinion of the Judges,* 85 S.D. 390, 182 N.W.2d 849 (1971) (Hanson and Wollman dissenting).

Assuming the Applicants produce the facts to support their claim, the Applicants would also have to persuade this Court to exercise its discretion, rather than demand a writ of quo warranto as a matter of right.[6] *Putnam, supra,* 232 N.W. at 22. With February 1, 1993, fast approaching, Applicants had direct access to a circuit court for a cause of action in quo warranto but only a discretionary plea to this Court.

Pursuant to Art. V § 12, this Court is vested with the general supervision over all courts of this state. Were we to not act at this point, Severson and Caldwell could assume office on February 1, 1993, with a question as to their legal authority to act. The public has the right to know that it can rely on the legality of the actions of the circuit courts of this state. Having this issue continue to fester with Severson and Caldwell sitting on a legally questionable bench while the Applicants navigate their claim through the long and winding legal road of normal quo warranto proceedings is not in the best interest of anyone. Thus, we deem the exceptional circumstances of this case and the public interest involved appropriate to deviate from the general rule cited herein and will address the Applicants' issue on the merits. *See State v. Grayston,* 349 Mo. 700, 163 S.W.2d 335 (1942).

## ISSUE III

MUST APPOINTEES TO THE POSITION OF CIRCUIT COURT JUDGE BE VOTING RESIDENTS OF HIS OR HER CIRCUIT AT THE TIME OF APPLICATION FOR APPOINTMENT OR PRIOR TO HIS OR HER ASSUMING OFFICE?

*1. Introduction.*

Article V, § 6 of the South Dakota Constitution states in part:

Justices of the Supreme Court, judges of the circuit courts and persons presiding over the courts of limited jurisdiction must be citizens of the United States, residents of the state of South Dakota and voting residents within the district, circuit or jurisdiction from which they are elected or appointed.

The language used in a constitution is of the primary importance in determining when the qualification to office must exist. *Kneip v. Herseth,* 87 S.D. 642, 214 N.W.2d 93, 102 (1974); *Slater v. Varney,* 136 W.Va. 406, 68 S.E.2d 757, 768 (1951) *citing* 42 Am.Jur. Public Officers §§ 39 and 40. In the case of constitutional amendments, the legislative history and historical background can also be of assistance should there be an ambiguity in the constitutional language which requires interpretation by

---

**6.** For the Applicants to pursue an action in quo warranto on their own, under SDCL 21-28-2(1) they must establish they have "a special interest in the action." In *Smith v. Reed,* 60 S.D. 311, 244 N.W. 353 (1932) this Court held that a defeated candidate has such a special interest. However, in *Knockemuss v. De Kerchove,* 66 S.D. 446, 285 N.W. 441 (1939) we ruled that a private citizen claiming a special interest could not do so merely on the claim he was a citizen and a taxpayer. Thus, Applicants Andal and Kabeiseman would not have this special interest as they never sought the positions ultimately awarded to Caldwell and Severson. Even Cummings, who applied for Severson's position, would have difficulty because he cannot establish whether his name was on the certification list sent to the Governor. As this determination by the Judicial Qualifications Commission is confidential, he cannot be faulted for failing to clarify this point.

On the other hand, a taxpayer or elector has standing to privately maintain a mandamus or prohibition action where the relief sought is a public matter or one of public right. *State ex rel. Schilling v. Menzie,* 17 S.D. 535, 97 N.W. 745 (1903).

While we do not rely on this "standing" matter as decisive in determining this issue because of time constraints placed on the parties and this Court, together with the brevity of the record, it serves to re-enforce the conclusion that a request for prohibition should be considered on the merits as the Applicants do not necessarily have a "plain, speedy and adequate" remedy in quo warranto.

principles of construction. *South Dakota Auto Club Inc. v. Volk*, 305 N.W.2d 693, 697 (S.D.1981).

## 2. The Historical Background and Legislative History of Art. V, § 6 of the South Dakota Constitution.

The historical background provides guidance in addressing this question. *City of Sioux Falls, v. Sioux Falls, Etc.*, 89 S.D. 455, 234 N.W.2d 35, 37 (1975). Current Art. V, § 6 is the 1972 successor to the former Art. V, §§ 10, 25 and 37 of our 1889 Constitution. The prior Art. V, § 25 required that to be elected a circuit court judge, the candidate had to meet the following residency requirement: "no person shall be eligible to the office of judge ... unless he shall ... at the time of his election be a resident of the district for which he is elected." Art. V, § 37, which dealt with residency and appointed judges, stated:

All officers provided for in this article shall respectively reside in the district, county, precinct, city or town for which they may be elected or appointed. Vacancies in the elective offices provided for in this article shall be filled by appointment until the next general election as follows: All judges of the Supreme, circuit, and county Courts by the Governor. ...

Thus, under our former system an elected circuit court judge was specifically required to reside in his circuit at the time of election.

The Governor, Severson and Caldwell argue that in 1972 when the current Art. V, § 6 was approved by the voters, the prior specific requirement of residency at the time of election prior to taking office was deleted.

In *South Dakota Auto Club Inc. v. Volk, supra,* 305 N.W.2d at 697, this Court analyzed the reasons for going through the numerous steps necessary to amend our State Constitution:

Usually amendments are adopted for the express purpose of making a change in the existing system. Particularly applicable in the case of amendments are the rules relating to the intent of the framers and adopters and attainment of the object of a constitution. 'The courts are under the duty to consider the old law, the mischief, and the remedy, and to interpret the constitution broadly to accomplish this manifest purpose of the amendment.' [Citations omitted].

Art. V, § 6 was originally drafted by the Constitutional Revision Commission. When the meaning of words or terms employed in a constitution is uncertain or ambiguous, resort may be had to the view of the drafting body of that provision as an aid in determining its meaning and the intent, if it can be gathered from such proceedings. *State ex rel. Rausch v. Amerada Petroleum Corp.*, 78 N.D. 247, 49 N.W.2d 14, 21 (1951). In its 1971 report to the legislature, the Commission discussed the effect that Art. V, § 6 would have if it were enacted to replace the then existing constitutional provisions:

This section omits the present period of residency and age requirements. Both are arbitrary standards which often have little relevance to the qualifications needed for a judicial position. A period of residency does not seem logical in the modern transitory society. ... [7]

The above conclusion of the Constitutional Revision Commission as to residency requirements supports the arguments of the

---

7. Views of individuals involved with the legislative process as to intent have not received the same recognition from this Court. We held such individual testimony of no assistance in State v. Bushfield, 69 S.D. 172, 176, 8 N.W.2d 1, 3 (1943) for two reasons: (1) it is the intent of the legislative body that is sought, not the intent of the individual members who may have diverse reasons for or against a proposition and

(2) it is "universally held" that "evidence of a ... draftsman of a statute is not a competent aid to a court in construing a statute." The case now before us shows the wisdom of this prior holding.

The Applicants offer the affidavit of Robert E. Driscoll III, current Dean of the University of South Dakota School of Law, concerning his recollections as a drafting consultant to the Con-

Respondents. With the above stated Commission goal of doing away with "illogical" residency requirements, it would make little sense to require an attorney to declare residency in the circuit with a judicial vacancy just days prior to making application to the Judicial Qualifications Commission[8] or just prior to receiving the appointment. Thus, the logical conclusion is that the Commission felt that adopting Art. V, § 6 would require establishment of residency prior to the judge taking office.

> The object to be sought is the thought of the constitution makers in the use of this expression.... In case of doubt between different constructions claimed for a constitutional or statutory provision, or the meaning of a term, it is always allowable to inquire what results would legitimately follow either with a view of ascertaining, if possible, whether such consequences were contemplated or intended.

*McGee v. Gardner, supra*, 3 S.D. at 557, 54 N.W. at 607, *cf. Aman v. Edmunds Central School Dist.* 494 N.W.2d 198, 200 (S.D. 1992).

*3. The Language of Art. V, § 6.*

■ The Applicants argue that the words "from which" found in Art. V, § 6

require voting residency[9] at the time the candidate makes application for the judicial vacancy to the Judicial Qualifications Commission. Initially, it should be noted that words such as "from," when used with respect to measurement of time, have no fixed or specific meaning. "Standing alone they are ambiguous and equivocal." *Fetters v. City of Des Moines*, 260 Iowa 490, 149 N.W.2d 815, 818 (Ia.1967). Additionally, these words cannot be analyzed in isolation to the exclusion of the rest of the provision. "No wordage should be found to be surplus. No provision can be left without meaning." *Kneip, supra*, 87 S.D. at 659, 214 N.W.2d at 102. "If possible, effect should be given to every part and every word." *State ex rel. Oster v. Jorgenson*, 81 S.D. 447, 136 N.W.2d 870, 875 (1965).

The same issue that is now before this Court was addressed by the Oklahoma Supreme Court in the case of *State ex rel. Stuart v. Rapp*, 632 P.2d 388 (Okla.1981). It concluded:

> Query: When must an appointee for such office become a legal resident of Pawanee County?

stitutional Revision Commission during 1970–1. Dean Driscoll recollects that it was the Commission's intent that a candidate be a voting resident at the time of his or her appointment and prior thereto.

The Governor counters with the affidavits for former Chief Justice Jon Fosheim and Ronald D. Olinger, former Executive Secretary to the Constitutional Revision Commission.

It was former Chief Justice Fosheim (then a circuit judge who would have to live under any residency requirement) as a subcommittee chairman, that oversaw the drafting and revision of Art. V, § 6. Olinger was involved in the day to day work of the Committee and oversaw its staff. Both men state that it was the Commission's intent that the prior residency requirement be abolished and that this is verified by numerous drafts which so state in its commentary as well as the final commentary which was placed on every legislator's desk.

All three of these individuals have served the public and the legal profession with distinction and integrity. All are called upon to resurrect events that occurred over twenty years before. The documentary evidence would lend credence to the Fosheim/Olinger view. Dean Driscoll

states in his affidavit that he was not present for several commission meetings including the final ones where the recommendation to the Legislature was prepared. This probably explains the difference in recollection as it is clear that early on in the Commission proceedings residency requirements were discussed.

In summary, this shows the difficulty of relying on the views of one or two persons, well after the fact, as establishing the consensus of the body as a whole.

8. Applicant Cummings conceded at oral argument that had Severson and Caldwell done this, even under Cummings' interpretation of Art. V, § 6, the actions of Caldwell and Severson would have met Cummings' interpretation of that provision's residency requirement.

9. The 1972 Amendment also changed the requirement from "resident" to "voting residents." As was noted at oral argument, this was probably in reaction to the demise of durational residency requirements which had previously been used to determine "residency." "Voting residency" is defined in SDCL 12–1–4 which was enacted in 1973.

An appointee would not become a judge until he fulfilled all conditions precedent to his qualification and entered upon the duties of his office. Therefore, at the time an appointee takes and subscribes his oath of office, and entered upon the duties of his office, he must be a legal resident of Pawnee County. [Citation omitted].

632 P.2d at 391.

By the 1972 Amendment, the scope of the constitutional provision went from a "person ... eligible to the office of judge of the circuit ... court" to simply "judges of the circuit courts." SDCL 16-1A-1(2) defines a "judge" as "a justice of the Supreme Court, a judge of the circuit court, or a judge of a court of limited jurisdiction." See also SDCL 15-12-20(3).

The "logical results" analysis of *McGee* applied to the facts of this case show the fallacy of the Applicants' argument. On December 11, 1992, both Judge Hertz and Judge Heege still legally occupied their positions. There is no provision cited which would allow two different individuals such as Heege and Severson to simultaneously exercise the powers of a circuit court judgeship when only one position is authorized by law. *See* SDCL 16-6-1. "It is self evident that merely seeking the office of ... judge ... does not involve the exercise of judicial powers." *Jordan v. Pearce*, 91 Idaho 687, 429 P.2d 419, 421-2 (1967).

Art. V, § 6 refers to "judges" not "applicants," "certified applicants" or something akin to persons appointed by the Governor but whom have not qualified pursuant to SDCL 3-4-7. Severson and Caldwell are not "judges" but in the language of former Art. V, § 25 they are a "person ... eligible to the office of judge of the circuit court...." As we held in *Kneip*, the framers of the Constitution use words in their natural sense and fully intend what they say. 87 S.D. at 658, 214 N.W.2d at 102, *citing Schomer v. Scott*, 65 S.D. 353, 274 N.W. 556 (1937). Just because an applicant obtains the right to hold office does not automatically make him or her into to a circuit judge. Subsequent events such as a change in career plans or the misfortunes of life may intervene. *See In re Supreme Court Vacancy*, 4 S.D. 532, 57 N.W. 495 (1894).

The North Dakota Supreme Court in the case of *Nielsen v. Neuharth*, 331 N.W.2d 58 (N.D.1983) was faced with the same issue. Therein the candidate for judge who prevailed in the election was not a resident of his district at the time of his election but became a resident prior to his taking office. In holding that the residency requirement applied prior to taking office, rather than prior to the election, the Court reasoned:

where the word "eligibility" is used in connection with an office, and there are no explanatory words indicating that such word is used with reference to the time of election, it has reference to the qualification to hold the office rather than the qualification to be elected to the office.

331 N.W.2d at 60, *quoting Enge v. Cass*, 28 N.D. 219, 226, 148 N.W. 607, 609. *See also Jordan, supra*, 429 P.2d at 423.

Article V, § 6 does not contain the word "eligibility." However, its command that "judges of the circuit court ... must be ... voting residents within ... the circuit ... from which they are ... appointed" certainly amounts to an eligibility requirement. Thus, the rationale of the North Dakota and Idaho Supreme Courts is of assistance in this question. This analysis also appears to be the one adopted by a majority of other jurisdictions that have ruled on this issue. *Slater, supra*, 68 S.E.2d at 769; *State ex rel. Dostert v. Riggleman*, 155 W.Va. 808, 187 S.E.2d 591, 595 (1972).

To construe Art. V, § 6 as contended by the Applicants would require this Court to incorporate sections into this provision which simply are not there anymore. *State ex rel. Holmes v. Finnerud*, 7 S.D. 237, 64 N.W. 121, 124 (1895). They were there from 1889 to 1972 as to judicial elections. They were removed by the legislature and the voters at that time by the constitutional amendment process. This amendment was submitted to an informed electorate who must be presumed to have known the rea-

sons for the recommended changes. *Barnhart v. Herseth*, 88 S.D. 503, 222 N.W.2d 131, 137 (1974). Had the will of the legislature and the people been to retain or expand the previous residency requirements for judges, the same could have been easily drafted into Art. V, § 6. *Kneip, supra*, 214 N.W.2d at 102; *Aman, supra*, 494 N.W.2d at 199.[10]

We have examined the other claims of the Applicants and deem them without merit.

## CONCLUSION

We hold that a person appointed to the office of circuit court judge must establish residency in that circuit prior to assuming said office. Thus, we conclude Governor Mickelson acted in accordance with Art. V, § 6 in the appointments of Severson and Caldwell.[11] The Applicants' request for a writ of prohibition is denied.

MILLER, C.J., concurs.

STEELE, Circuit Judge, concurs with writing.

HENDERSON, J., concurs in part and dissents in part.

SABERS, J., dissents.

GILBERTSON, Circuit Judge, for WUEST, J., disqualified.

STEELE, Circuit Judge, for AMUNDSON, J., disqualified.

STEELE, Circuit Judge (concurring).

I concur in result, but I would hold that this action should be treated as in quo warranto, and that a judicial candidate or applicant need be a resident of the circuit

**10.** An early Commission draft of September 3, 1970, contained a requirement that a Supreme Court Justice be a resident "when appointed or elected." Thus, it is clear that the Commission considered the concept of residency prior to taking office in some form. This language was not retained and after numerous subsequent drafts, Art. V, § 6 was to become the Commission's recommendation without dissent.

The Legislature which passed Art. V, § 6 is also certainly capable of enacting statutes containing residency requirements when it feels such a requirement is justified. SDCL 12-6-3.1 states:

from which he or she is elected or appointed at the time of election or appointment and not before.

## PROCEDURE

The applicants seek a writ of prohibition pursuant to SDCL 21-30. The original request was to prohibit Governor Mickelson from appointing Severson and Marshall (later Caldwell) to the position of circuit judge. When the petition was answered by the defendants, it was established that 1) the appointments were already made, and 2) that Severson and Caldwell were voting residents of their respective circuits at the time the appointments were made. The request for relief was then amended, seeking to prohibit Severson and Caldwell from taking their oaths of office, or in the alternative to prohibit the oath giver from administering the oaths.

The applicants' contention is that Severson and Caldwell are not qualified to take office because they were not residents of the Second and First Circuits, respectively, at the time they applied for their positions. Therefore, the issue is whether the defendants Severson and Caldwell are entitled to their offices.

A writ of prohibition may be issued only when a person is acting or is about to act without or in excess of his jurisdiction. SDCL 21-30-1. Prohibition is not the proper remedy when the act complained of has already been completed. *Williamson v. Herseth*, 78 S.D. 476, 104 N.W.2d 473 (1960). Here, the appointments have already been made, and the gravamen of the action is a challenge to the qualification of Severson and Caldwell to hold office.

Any candidate for office in the state Legislature shall be a resident of the district for which he is a candidate at the time he signs his declaration of candidacy as required by this chapter.

**11.** The litigants in this matter have presented this Court with public policy reasons as to why appointments to the circuit court bench should or should not be made in this manner. These issues are not to be settled in this Court but rather rest with the public and its elected officials. We take no position on this political question.

The proper action to try title to office is by quo warranto, rather than by prohibition. *State ex rel. Walklin v. Shanks*, 25 S.D. 55, 125 N.W. 122 (1910). A quo warranto action may be brought by a private person who has a sufficient "special interest" in the action. SDCL 21–28–1. Original jurisdiction may be assumed by this court in a quo warranto action. S.D. Const. art. V, § 5; SDCL 15–25–1.

In this case, plaintiffs Kabeiseman and Andal would lack standing to bring an action in quo warranto because their alleged interest is that of a voting resident in their respective circuits, which is insufficient. *Knockenmuss v. DeKerchove*, 66 S.D. 446, 285 N.W. 441 (1939). Cummings would have a special interest in the action against Severson because he (Cummings) did apply for the Second Circuit vacancy. Theoretically, if Cummings is correct that one must be a voting resident of the circuit at the time of application, then the field of applicants should have been narrowed to only voting residents in the Second Circuit, and his name may have been forwarded by the Qualifications Commission to the governor for consideration. His interest would therefore be more than a taxpayer or voter interest. He would not have standing to challenge Caldwell's title to office because he was not a resident of the First Circuit when he applied.

The proper party plaintiff would therefore be Cummings and the proper defendant would be Severson. Because this matter involves substantial public interest and all parties except Governor Mickelson have requested a decision on the merits, I would call the action what it is and would treat it as in quo warranto. I would grant leave to Cummings to bring the action against Severson and would dismiss Kabeiseman and Andal as parties plaintiff and Mickelson and Caldwell as parties defendant.

### MERITS

At the heart of the controversy is the interpretation of Art. V, § 6 of the South Dakota Constitution. In this writer's opinion, that section is ambiguous because it does not specifically state as of when one must be a voting resident of the circuit. Therefore, the Court can look to the rules of construction to determine the intent of people. *Schomer v. Scott*, 65 S.D. 353, 274 N.W. 556 (1937).

Here, we should look to the legislative history of the article, its purpose, the provision as it existed prior to amendment, the object sought to be obtained by the amendment, and the consequences of a particular construction. *State ex rel. Payne v. Reeves*, 44 S.D. 568, 184 N.W. 993 (1921); 73 Am.Jur.2d, *Statutes*, §§§ 150, 155, 192; Uniform Statutory Construction Act, § 15. Regard should be given to the whole instrument to harmonize various provisions. *South Dakota Auto Club v. Volk*, 305 N.W.2d 693 (S.D.1981).

Art. V, § 6, replaced the old Art. V, §§ 25 and 37. The old § 25 provided:

No person shall be eligible to the office of judge of the circuit ... courts unless he be learned in the law, be at least twenty-five years of age, and a citizen of the United States; nor unless he shall have resided in this state ... at least one year preceding his election, and *at the time of his election* be a resident of the ... circuit ... for which he is elected. (emphasis added).

Under this section, an election candidate must have met the citizenship, residency, and age requirement to be eligible to run for office, but need not have been a resident of the circuit until the time of the election.

The old § 37 stated:

All officers provided for in this article shall ... reside ... in the district ... for which they may be elected or appointed. Vacancies ... shall be filled by appointment until the next general election as follows: All judges of the ... circuit ... courts, by the governor.

SDCL 3–4–7 was in effect prior to the amendment, and provided:

Persons appointed to offices as herein provided shall qualify in the same manner as is required of those elected....

Whatever the practice may have been, it is clear from the above provisions that prior to the amendment, a candidate or an appointee must have been a citizen of the United States, twenty-five years old, and one-year resident of South Dakota to be eligible to run for election or to be appointed but need not have been a resident of the circuit for which he was elected or appointed until the time of the election or appointment.* Appointments are complete when the appropriate certificate of appointment is filed with the Secretary of State.

The purpose of the new provision was to relax the qualification requirement by eliminating the age and one year residency provisions, because they were "[a]rbitrary standards which often have little relevance to the qualifications needed for a judicial position." Report and Recommendations of the Constitutional Revision Commission, v. I at 44–45.

The language in the new provision is that judges of the circuit courts must be "[c]itizens of the United States, residents of the State of South Dakota, and voting residents within the circuit from which they are elected or appointed." There is nothing in the legislative history of Art. V, § 6 which indicates any intent to change the old requirement that one need only be a resident of the circuit at the time of election or appointment; the intent was merely to eliminate the age and durational residency requirements. It must be assumed that the new provision was intended to be consistent with SDCL 3–4–7, which put elective and appointive officers on equal footing concerning qualifications. That statute was in effect at the time of the amendment, and has not been repealed.

The phrase "from which they are elected or appointed" construed in light of the old provisions and the mischief sought to be remedied, means that a judge must be a resident of the circuit from which he or she is elected or appointed, but that he or she need only be a resident from that circuit at

the time of election or at the time of appointment. This construction would reconcile all of the new provisions with the old, and would have the effect of treating judicial candidates and appointees equally in terms of residency requirements, consistent with SDCL 3–4–7.

Because defendant Severson was a voting resident of the Second Circuit at the time of his appointment, I would hold that he is entitled to his office.

HENDERSON, Justice (concurring in part; dissenting in part).

## OVERVIEW

The following is my view on this case believing the majority's authorities support my position. A vital flaw in the majority's holding is that it uses a historical perspective to support its conclusion, but it fails to include the history behind the phrase "voting resident." Thus, the writing I now contribute analyzes the latter phrase and reaches the opposite result. Accordingly, I respectfully dissent.

Significant to the issues before this Court is when Severson and Caldwell became eligible to serve as judges in their respective circuits. In Article V, § 6 of the South Dakota Constitution, we find the necessary residency qualifications:

> Justices of the Supreme Court, judges of the circuit courts and persons presiding over the courts of limited jurisdiction must be citizens of the United States, residents of the state of South Dakota and voting residents within the district, circuit, or jurisdiction from which they are elected or appointed.

The Constitution plainly states that Severson and Caldwell must be "voting residents within the district, circuit, or jurisdiction *from which* they are elected or appointed." (Emphasis supplied). After review of the South Dakota law, reports of the Constitutional Revision Commission, and decisions

---

* It is recognized that SDCL 12–9–5 (repealed in 1974) was seemingly inconsistent with art. V, § 25, in that the candidate had to declare in his petition that he was a resident of a county, which by implication had to be within the circuit in which he or she was running. The constitutionality of that statute was never litigated, and that issue would now be moot because of the repeal.

from other jurisdictions, the majority writing holds "that a person appointed to the office of circuit court judge must establish residency in that circuit prior to assuming said office." With this part of the holding, I concur. Nevertheless, I cannot agree with the majority writing for the very authorities upon which it relies mandates the opposite conclusion: Applicants are not eligible for appointment.

Perhaps the majority opinion is analytical and logical, but it does arrive at the wrong answer. It is unreasonable because it has missed the historical perspective of "voting resident." It may be likened unto a person who is given a set of numbers. After totaling the figures, he or she reaches a correct and confident answer. Unfortunately, the answer is incorrect because one number was never furnished to the person doing the arithmetic. Although the majority writing has a confident answer, much like the mathematician above, it is missing some important information.

### FACTUAL BACKGROUND

On December 4, 1992, Governor Mickelson was served with an Application for Writ of Prohibition. On December 6, 1992, our Governor aggressively forged ahead, appointing Caldwell to the position of Circuit Judge of the First Judicial Circuit. She was then a voting resident of the Second Judicial Circuit. Severson was appointed to Circuit Judge for the Second Judicial Circuit. At that time, he was a voting resident of the Third Judicial Circuit. On December 11, 1992, the Governor caused to be filed with the Secretary of State Certificates of Appointment. As far as I can determine from the record herein, on December 11, 1992, Caldwell was not a voting resident of the First Judicial Circuit and Severson was not a voting resident of the Second Judicial Circuit. They were not voters there, did not vote there, and had essentially established only a mailing address there just days earlier. These appointees maintain that those facts are immaterial; they urge that if they become voting residents of the circuits to which they were appointed *before taking the oath of office*, they are in compliance with

Section 6, Article V of our State Constitution. Needless to say, the two appointees, to bring themselves within their theory, trod to the respective courthouses and then and there (for the first time) become registered to vote. This is fast action in the practical world of State Government as it exists today.

### ANALYSIS

Upon reading the writing of Justice Sabers, I was prone to concur therein. There are but few expressions therein to which I could not fully subscribe. Believing I have certain observations akin to his but are independent thoughts relating to the justice of this case, this dissent was born. I took it upon myself to read every page of all of the minutes of the Constitutional Revision Commission. Under various discussions of the Judicial Article, the participants would mention, by consensus, that Judges should be "geographically distributed"; further, that there should be "geographical districts." Sometimes, one reads "geographical areas." Unquestionably, the geography of our state was in the minds of this Commission. *See*, as an example, the May 6 and 7, 1971, minutes of said Commission. Therein, it reflects that the concept of electing judges be preserved and the election of circuit judges and justices be geographically distributed. There was very strong contention that Justices come from diverse areas in view of varying "terrain and economic factors." This latter contention became a "consensus."

If this state continues to follow the theory of the majority opinion, the people's will shall be thwarted and we could entertain chaos. There are, as an example, lawyers licensed to practice law in South Dakota who live in many distant states. Many live in nearby Nebraska, Minnesota, and Iowa. Were they appointed, and never having lived in South Dakota, *or* having lived in South Dakota many years past, they could receive an appointment—register to vote in one day—and become a Circuit Judge the following day. Remember, Article V, Section 6, requires circuit judges to be voting residents of the circuit *from which* they

are elected or appointed. Under the majority's theory, a lawyer from Lemmon (extreme northwestern part of the state) may run for circuit judge located at Canton (extreme southeastern part of the state); he or she qualifies (even though a non-voting resident of the circuit wherein Canton is located), under the majority holding, so long as he or she is elected and takes the oath of office. Residence, as a requirement, would be rendered meaningless.

When reviewing constitutional amendments, we look to the historical background should there be ambiguity in the constitutional language requiring interpretation by principles of construction. *South Dakota Auto Club Inc. v. Volk*, 305 N.W.2d 693 (S.D.1981). The historical background provides guidance in addressing this issue. *City of Sioux Falls v. Sioux Falls Firefighters*, 89 S.D. 455, 234 N.W.2d 35, 37 (1975).

On December 11, 1992, Governor Mickelson *officially* appointed Severson as circuit court judge in the Second Circuit and Caldwell as circuit court judge in the First Circuit. Prior to their appointment, neither was a resident of the respective circuit. Upon notification of their impending appointments, both Severson and Caldwell registered to vote in counties located within their soon to be new home circuits. This action was taken in hopes of fulfilling the voting resident requirements of Art. V, § 6. Severson registered on December 1, 1992. Caldwell did not bother to register until the day of appointment. Ironically, Caldwell was a bona fide resident of the Second Circuit when the judicial position opened. Apparently, Severson got the Governor's attention first.

In 1963, the Legislature enacted SDCL 12–4–8 detailing voter registration. When registering to vote, a person was required to attest to the following:

> I hereby declare, under penalty of perjury, that I am a citizen of the United States and that I am or will be 21 years of age on the next ensuing School, Township, Special Municipal, Primary, General, or Independent School District Election and that I have resided in the United

States 5 years, the State of South Dakota 1 year, _____ County 90 days and the _____ Ward and _____ Precinct and _____ Independent School District 30 days and am legally qualified to vote.

By state law, as it existed in 1972, when the constitutional amendment became operative, one was obligated to reside in a county for at least 90 days before becoming a registered voter in that county. The majority relies upon the definition of voting residency as stated in SDCL 12–1–4. However, that statute was not enacted until 1973—one year after the passage of the amendment. In 1972, the people perceived the amendment as "must be residents of the United States, residents of the state of South Dakota, and have resided for 90 days within the circuit from which they are appointed." These words and "voter residents" were equivalent terms when Art. V, § 6 was passed. Thus, when voting on Art. V, § 6, voters knew of and were bound to the 90 day requirement.

I am cognizant of *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), where the United States Supreme Court struck down a Tennessee law requiring a three month residency to vote. Nowhere in that opinion did the Court limit durational requirements for judicial residency. Art. V, § 6 used voter residency as a measuring stick for length of residency, not as a means for restricting an appointee's right to vote.

Although this 90 day requirement has since been removed from the statutes, it was a requirement for voter residency in 1972 when Art. V, § 6 was approved by voters. South Dakota voters could only vote on what they knew to be the law when they bought into the idea of amending the Constitution. It is the missing number. Statutorily, the Legislature may redefine a term, but to change the definition of the Constitution requires the vote of the people.

Therefore, Severson and Caldwell should be residents of Minnehaha and Lincoln Counties, respectively, for at least 90 days before becoming residents of their respective circuits. This would comport with the

constitutional amendment and the intent of the people. Otherwise, we permit a feigned residency to be created upon the Governor's notice of an intent to appoint: In essence, judicial carpetbagging. Although I do not suggest that they postpone their right to register to vote, I do profess that the voters in 1972 understood that their judges would reside in the circuit *at least* 90 days before being appointed as circuit judge.

Intent of the drafters of the amendment, although extremely important, should not be the singular focus; rather, we must strongly consider that which the people knew the law to be when they cast their ballots for the constitutional amendment. This amendment was submitted to an informed electorate who must be presumed to have known the reasons for the recommended changes. *Barnhart v. Herseth*, 88 S.D. 503, 222 N.W.2d 131, 137 (1974). Had the will of the Legislature and the people been to alter the previous residency requirements for judges, such could have easily been drafted into Art. V, § 6. *Kneip v. Herseth*, 87 S.D. 642, 214 N.W.2d 93 (1974). This was not done. When registering to vote on Art. V, § 6, people learned that the residency requirement was 90 days. They had to know this in order to vote; the county auditors were responsible to know that a person had a 90 day residency. It was the law when the amendment was passed. Such must be the true intent of voter residency as we interpret it today. To hold otherwise amounts to rewriting the State Constitution by simply changing the statutes. The Constitution is the mother law. It is not the baby. Statutes must conform to the Constitution, not vice versa.

By following the very authorities and jurisprudence cited by the majority, we cannot ignore the definition of voter residency as it existed when Art. V, § 6 was enacted. As the informed voters knew the law to be in 1972, a candidate/appointee for circuit judge was required to live in a county 90 days before becoming a voting resident of the respective circuit. That is what the voters relied upon and voted for—not the hindsight now applied by this Court.

Essentially, I agree with the discourse on Issues 1 and 2 of the majority opinion. A writ of prohibition is the proper remedy here. However, I would issue it to prohibit these two appointees from taking office. Certainly the facts in this case are "capable of repetition, yet evading review." It is by this standard that the United States Supreme Court hears cases that are allegedly moot. *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Southern Pacific Terminal Co. v. Interstate Commerce Comm.*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). As the Governor is capable of repeating the same actions, this Court has authority to hear this case and enforce a writ of prohibition under the authorities cited in the majority opinion. *Sedlacek v. S.D. Teener Baseball Program*, 437 N.W.2d 866 (S.D.1989); *Corbly v. Matheson*, 335 N.W.2d 347 (S.D.1983); *Brandon Savings Bank v. Swanson*, 54 S.D. 95, 222 N.W. 660 (1928).

Frankly, I believe the decision of this Court lessens the qualifications of the judiciary in this state. It is antithetical to the concept of a self-governing people. Judges preside over matters of the greatest importance in people's lives. Judges need roots. Roots so they are implanted with their own people. People should know their judges, where they come from and what kind of people they are. Were it not so, there would be no election of judges in this state. Obviously, that is not true, because under Art. V, § 7 of the South Dakota Constitution and SDCL § 12-9-1, people do have a right to vote for their judges. The framers of the Constitution and the people of South Dakota, in amending our State Constitution, did not intend a "have suitcase, have briefcase, will travel, with gavel" appointment process. Stranger in town? That's your new judge.

SABERS, Justice (dissenting).

I vote to grant the writ of prohibition.

Neither applicant is presently eligible to be a circuit court judge because neither one is a voting resident within the circuit from which they are to be appointed. This is clear from a plain reading of the text,

history, precedent and policy surrounding Article V, Section 6, of the South Dakota Constitution.

TEXT

> [J]udges of the circuit courts ... *must be ... voting residents within* the [ ] circuit ... *from which* they are elected or appointed.

S.D. Const. art. V, § 6 (emphasis added). According to the plain language of the constitution, a circuit court judge *must be* a *voting resident* within the circuit *from* which they are elected or appointed at the time of election or selection by the Judicial Qualifications Commission (JQC). The constitution does not say "registered to vote" or "eligible to vote." Instead, it says "voting resident[ ] from." In this context, these words mean that the applicant must have voted in the circuit prior to election or appointment.

South Dakota statutes provide that individuals seeking election as a circuit court judge must meet constitutional and statutory qualifications. SDCL 12–9–4.[1] These include the requirement that they be a voting resident of the same circuit as the signatures on their nominating petitions. SDCL 12–6–8.[2] According to SDCL 3–4–7[3], individuals applying for judicial appointment must qualify in the same manner as required of those elected.[4] Therefore, it is clear that, at the time of application to the JQC, an applicant must be a voting resident in the circuit from which they apply for appointment as circuit court judge.

According to Webster's Third New International Dictionary, "voting" is defined as "the act or process of casting a vote esp. in a political election." Webster's Third New International Dictionary 2565 (1976). Neither applicant was a voting resident at the time of application for selection by the JQC or appointment by the Governor, but, was, simply registered to vote. Article V, Section 6 does not say that judges must be registered to vote or eligible to vote. Rather, the section requires that a resident appointee have acted, i.e. cast a vote. In fact, just living in the circuit *for years without voting* is not enough.

> [V]oting is the affirmative act of marking the ballot and depositing it in the ballot box in conformity with the election laws. Neither signing the registry of voters, nor being issued a ballot, nor having one's name appear on the poll book is enough, standing alone, to constitute the act of voting.

*Montana ex rel. Cashmore v. Anderson,* 160 Mont. 175, 500 P.2d 921, 926 (1972). These plain words[5] require a voting resident.

---

1. SDCL 12–9–4 provides:

 Nominating petitions for judicial office filed pursuant to this chapter shall state the judicial position sought, using the designations established pursuant to § 12–9–3.1, which shall be filed in the office of the secretary of state within the time prescribed by § 12–6–4 and shall be signed by not less than fifty registered voters of the district or circuit or other division of court boundaries. To the extent it is consistent with this chapter, § 12–6–8 shall govern such petitions.

2. SDCL 12–6–8 provides in part:

 No person shall sign the nominating petition of a candidate ... for whom he is not entitled to vote.... There shall be added by either the signer or the circulator, the signer's place of residence, and the date of signing. A formal declaration of the candidate shall be signed by him prior to the circulation of petitions. The signed declaration of the candidate, or a facsimile thereof, may accompany and be a part of the petition. The original signed declaration shall accompany the group of petitions upon filing. Such petition shall be verified under oath by the persons circulating the same[.]

3. SDCL 3–4–7 provides:

 Persons appointed to offices as herein provided shall qualify in the same manner as is required of those elected, the time of which shall be prescribed in their appointment.

4. Application to the JQC for selection as one of the individuals qualified for appointment is analogous to obtaining signatures on a petition to have one's name placed on the ballot for election.

5. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people

Obviously, this language was chosen by the drafters for a particular purpose, inherent in its plain meaning. If those implementing the constitution do not like what the constitution says, they must get the people to change the constitution, not reinterpret it.

HISTORY

In interpreting and defining constitutional provisions, we frequently look to the intent of the draftsmen or framers. *See* 2A Norman J. Singer, Sutherland Statutory Construction § 48.11 (5th ed. 1992). "In the interpretation of such legislation the *reports of these committees or commissions* are considered valuable aids.... Such reports are acceptable interpretive aids under the same rule which justifies the use of legislative committee reports." *Id.*

Robert E. Driscoll, III [6], a drafting consultant to the South Dakota Constitutional Revision Commission (Commission) who assisted in the revisions, reorganization and drafting of Article V, submitted a sworn affidavit. According to Driscoll's affidavit, he prepared Article V, Section 6 in its present form, consistent with what he believed was the intent of the Commission. Driscoll's affidavit states:

> I provided that judicial personnel be residents of the district (in the case of Supreme Court Justices), circuit (in the case of judges of the circuit courts), or jurisdiction (in the case of persons presiding over courts of limited jurisdiction) from which they are elected or appointed. [ ] I also recall adding the word "voting" to the word "residents" to further reflect my understanding that the Commission's intent was that judges were to be elected or appointed from within the district, circuit, or jurisdiction of their voting residence where they would serve. [T]he word "from" was also chosen to reflect this understanding.

Driscoll's affidavit continues, and describes the Commission members' reactions to the misinterpretation and implementation of Section 6.

> [S]ometime following the first appointment of a judge from outside a district or circuit[,] I spoke informally to Dr. Farber [7] and later Justice Fosheim [8] commenting that this was not my understanding of what was intended in Section 6. [T]hey confirmed my understanding of the intent of Section 6 that judges were to be appointed to fill vacancies from within districts or circuits in which they were voting residents. That over perhaps ten or more years of such judicial appointments, whenever I would see these men and reminisce[,] I would informally suggest that we should perhaps leave an "oral history" of the *true intent* for the inevitable day when someone would challenge this practice and before all of the original Commission members were gone.

(Emphasis added.) It is clear from a reading of the Driscoll affidavit, that the intent of the Commission was that applicants for appointment as a circuit court judge be a voting resident from the circuit prior to submitting their name to the JQC.

Additional support for the intent of the framers is found in the minutes of the Commission. Although the Commission was discussing, at the time, the geographical distribution of the Justices of the Supreme Court, the discussion is analogous. According to the minutes, Mr. Robert

---

must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or extraordinary gloss[.]
*Boe v. Foss,* 76 S.D. 295, 303, 77 N.W.2d 1, 6 (1956) (citation omitted).

**6.** Robert E. Driscoll, III is the present Dean of the University of South Dakota School of Law.

**7.** Dr. William Farber, professor emeritus and former chairman of the Department of Government at the University of South Dakota, was a member of the subcommittee to review amendments and revisions to Articles III, IX, X, XIX, and XXIII.

**8.** Jon Fosheim was chairman of the subcommittee to review amendments and revisions to Articles V, VI, and VII. A former Chief Justice of the South Dakota Supreme Court, Fosheim is currently a licensed attorney in Huron, South Dakota.

Hirsch [9] noted an opposition to the need for geographical distribution of the Justices because the state Supreme Court represented the whole state and not any particular district. In response, Judge Fosheim explained that there would be a great deal of opposition to this point of view because "people [ ] believe that they need a representative on the Supreme Court *from their particular area.*" Minutes, Constitutional Revision Commission, May 6–7, 1991 (emphasis added).

As with Supreme Court Justices, people believe that the judges in their circuit represent them and their particular area of the state. To allow an individual from outside the circuit to be appointed as a judge contravenes and is in direct opposition to this theory and was rejected by the Commission, and in turn, by the people.

PRECEDENT

As Applicant Attorney Doug Cummings (Cummings) stated in his argument to the court, precedent indicates that for over ten years from the adoption of the constitutional amendments, applicants for circuit judge positions came from the circuits where the openings occurred and you had to be a voting resident to apply.

Cummings stated:

[I] would like to remind the court that what we're asking is not for a new system, or some kind of a new interpretation. This was the interpretation up until 1985 or 1986. Before that time the Judicial Qualifications Commission wouldn't even accept an application from someone who wasn't a resident of the circuits. Then came along the Judicial Qualifications Commission deciding that they were going to interpret it differently and opening up the application to anyone and saying "You can become a voting resident after you get the appointment." And that's when that has started[.]

Additional support for this theory is found in Driscoll's affidavit wherein he indicated that it has only been within approximately the last ten years that judicial appointments have come from outside the circuit. Neither the statements of Driscoll nor Cummings have been challenged or refuted.

As Driscoll and Cummings stated, precedent indicates that this is the correct practice, founded upon an accurate interpretation of the constitution, and not an attempt to change what the constitution states or means. The recent practice of the last seven years is the aberration and in direct contravention to the constitution. As indicated above, if a constitutional change is really desired, those wishing change must look to the people of the State of South Dakota to make that change.

POLICY

The policy of the State of South Dakota is set by the people of South Dakota. This is principally done by the people through enactment of a constitution, ratification of amendments, and enactment of statutes through their legislative representatives.

It is clear from the constitution that the people want to retain the right to elect circuit court judges. S.D. Const. art. V, § 7. It is also clear that the people want the circuit court judges they elect to come from and live in the area they serve. S.D. Const. art. V, § 6. It is equally clear that the people want appointment and election qualifications to. be equal. SDCL 3–4–7. No one would be foolish enough to argue that the office of a circuit court judge would not become vacant by his moving outside of the circuit he serves. *See* SDCL 3–4–1(5).

A circuit court judge is a constitutional officer. The position of circuit court judge is a state office established by the constitution. S.D. Const. art. V, § 3. A vacancy in a state office is filled by the people through election or appointment. When, however,

9. Mr. Robert Hirsch was a former state senator. At the time of the Commission, he was chairman of the subcommittee to review amendments and revisions to Articles III, IX, X, XIX and XXIII.

an election by the people is inconvenient, the Governor, as a servant of the people, is empowered by them to appoint someone to fill the vacancy. This does not, however, provide the Governor [10] with discretion to appoint someone to fill the vacancy who would not be qualified through an election. Rather, this requires that the Governor appoint someone who meets the same qualifications required of one elected to such position. SDCL 3-4-7.

Circuit court judges are empowered by the people to affect the lives of the people in many ways, including life, liberty, property and the pursuit of happiness. Therefore, it is only fitting and proper that the people want their judges to be from the people and area they serve. This is the policy of the people of the state of South Dakota. We must correctly interpret and follow it.

In conclusion, a plain reading of the text, history, precedent and policy makes it clear that neither applicant is presently eligible to be a circuit court judge because neither

one is a voting resident within the circuit from which they are to be appointed.[11]

---

**10.** I find no fault with the Governor's office, whose appointments have all come from the list supplied to his office by the JQC. This was in accordance with Article V, Section 7 of the South Dakota Constitution. The problem has been that the list included constitutionally non-qualified applicants.

The consequences of a correct vote in this case are neither disastrous nor life threatening. Cummings acknowledged on oral argument that even if he wins, these applicants could, and probably would, be reappointed upon becoming constitutionally qualified voting residents.

**11.** An examination of the majority opinion reveals numerous weaknesses.

1. It fails to set forth any substantial argument on *either* the *text* of the present constitution or the *precedent* or *practice* under it.
2. While it was explained to the Legislature that the constitutional enactment removed the durational period of time, as shown in the minutes of the 1971 report from the Commission, the "substituted" words require an applicant be a *voting resident from* the circuit. It doesn't matter whether one is a voting resident for two weeks or two months, as long as one is a voting resident. Likewise, what the Commission says *to* the Legislature about the *text* of the constitutional enactment is not as important as the words in the text themselves

as acted upon by the Legislature and the people. The Legislature and the people can read the words themselves. There is no proof that they even heard or read the Commission's comments or notes.

3. The affidavits of Jon Fosheim and Ronald D. Olinger are general in nature. Their duties were general, not specific. Neither one had any specific duty in choosing the words used, as did draftsman Driscoll. Neither Fosheim nor Olinger counter the specific choice by Driscoll of the words "voting resident from." If their memories were specific, certainly they would have countered Driscoll's affidavit concerning the specific conversations about the misinterpretation by the JQC. Also, Fosheim's "general affidavit" conflicts with his own specific response to Senator Hirsch as reported in the Commission's minutes. (See text surrounding footnote 9.)

4. The majority wholly ignores SDCL 3-4-1(5) and SDCL 3-4-7, both of which were in existence then and are now. The people are presumed to act on the law in existence. There is absolutely no support in this record for the claim that qualifications for those appointed is *less* than for those elected. The law is otherwise. SDCL 3-4-7.

5. Finally, the fatal defect or flaw in the majority's writing is that it misinterprets the words "voting resident from" to merely mean "registered to vote" or "eligible to vote."